ILENE PEPER, PLAINTIFF-RESPONDENT, v. PRINCETON UNIVERSITY BOARD OF TRUSTEES, WILLIAM BOWEN, F. SHELDON HACKNEY, ANTHONY MARUCA, WILLIAM REED, BRUCE EDWARDS AND STANLEY ADELSON, DEFENDANTS-APPELLANTS.

Argued April 25, 1978—Decided July 5, 1978.

58

*Mr. William J. Brennan, III,* argued the cause for appellants (*Messrs. Smith, Stratton, Wise and Heher,* attorneys; *Mr. Brennan, Ms. Ann Reichelderfer* and *Mr. Thomas H. Wright,* on the brief).

*Ms. Kathryn Trenner* argued the cause for respondent.

*Messrs, Lum, Biunno and Tompkins* submitted a brief on behalf of *amicus curiae* Fairleigh Dickinson University

*(Mr. Ronald H. DeMaria,* of counsel; *Mr. Dominick A. Mazzagetti,* on the brief).

*Mr. Steven Blader,* Assistant Deputy Public Advocate, submitted a brief on behalf of *amicus curiae* Public Advocate *(Mr. Stanley C. Van Ness,* Public Advocate, attorney).

The opinion of the court was delivered by

PASHMAN, J. The resolution of this action charging Princeton University with sex discrimination against one of its female employees requires our determination of the issues of subject matter jurisdiction, the proper scope of appellate review of a trial judge's findings of fact, and the selection of an appropriate standard for measuring the adequacy of a plaintiff's *prima facie* showing in an employment discrimination case. The plaintiff, Ilene Peper, complains that sex discrimination on the part of employees of Princeton University prevented her from being promoted. The appellant University challenges the propriety of the Appellate Division's reversal of the trial judge's finding of no discrimination. 151 *N. J. Super.* 15 (App. Div. 1977).

From August 1968 until her abrupt resignation on October 1, 1973, Peper was employed in the University Office of Personnel Services. There were four separate units in the Personnel Office: wage and salary, training and communications, benefits, and employment. She was assigned to the employment section of that office as one of three recruiters of employees for the nonacademic staff of the University, and given the title of Administrative Assistant.[1] Her direct supervisor during the four years she worked in the employment section was Bruce Edwards. On January 1, 1969 plaintiff

---

[1]Following is a list of the positions in the Princeton administrative hierarchy, from the lowest to the highest: Administrative Assistant, Administrative Associate, Administrative Officer, Senior Administrative Officer, University Officer, Senior University Officer, Executive Officer. One other position, Unclassified Administrator, was noted but was not placed in the hierarchy.

was promoted to the rank of Administrative Associate, with an attendant increase in salary. Her two peers in the employment section were James Barbour and Joseph Mignon, who were also recruiters. Peper had more work experience than the two men, as she had worked at the Accelerator Project at Princeton's Forrestal Campus from 1960 to 1965, when a family relocation had caused her to leave the employ of Princeton until August 1968. The two men, however, were college graduates which Peper was not. As of July 1969 all three held the rank of Administrative Associate. Later in 1969 Mignon was transferred to the wage and salary section. James Oliver was hired to take Mignon's place in the employment section as the rank of Administrative Assistant, one rank below Peper.

In 1970 Peper made her initial request to Edwards for a promotion. He denied the request due to budget limitations. In June 1971 she again requested a promotion. Edwards refused to single her out for promotion and indicated that she would not be promoted unless her peers in the employment section, Barbour and Oliver, were also promoted. At Edwards' request Peper prepared a memo to support her assertion that she had more experience than Barbour and Oliver and thus should be singled out for promotion. The memo outlined Peper's responsibilities at the Accelerator Project from 1960-1965. In January 1972 she received a raise but no promotion.

In early 1972 Peper volunteered to be transferred from the employment section to the training section of the Office of Personnel Services. She and Richard Horch, the Director of that office, contemplated that this temporary move of one to two years would broaden Peper's experience, enhancing her future promotability. This was a lateral transfer, not a promotion, and Peper several times testified that she did not expect a promotion during her tenure at the training section. Her new superior was Stanley Adelson, head of the Training section. Her overall employment goal was to become

a personnel manager. That position did not exist in the Office of Personnel Services. Apparently such a position did exist at both the Plasma Physics Plant and at the Accelerator Project. Peper's position in the employment section was taken by Barbara Smith, a college graduate, who started at the rank of Administrative Assistant.

Richard Horch left Princeton in September 1972, and Bruce Edwards was named acting Director of the Office of Personnel Services. When William Reed was appointed as the new Director in February 1973, Edwards was appointed to a new position, Associate Director of the Personnel Office. However, there was no discernible change in his duties. Nevertheless, Peper concluded that there was an opening for Edwards' former position of Assistant Director of the employment section. She was told there was no vacancy and that there would be none until the 1974 reorganization of the Office of Personnel Services. Peper was not satisfied with this explanation and alleges that this constituted an instance of sex discrimination against her. She left her employment in October 1973 prior to the planned reorganization of the office. The position of Assistant Director of the employment section was eventually filled after the 1974 reorganization, when it went to Barbour.

The other alleged act of unlawful discrimination occurred in 1973, when Mignon and Barbour were promoted to Administrative Officers effective July 1. These promotions were announced in April. Peper, who was still in the training section, was not promoted. Oliver, who was still in the employment section, also failed to receive a promotion. Barbara Smith was promoted to Administrative Associate in the employment section. It is this disparate treatment of Peper as compared to her male peers which she claims constitutes a *prima facie* showing of sex discrimination.

In early August 1973 Peper talked with Reed about her non-promotion. He told her that not all of her evaluations were good, and that she should be patient. He noted that

she was to be one of the four regional representatives in the "Plan A" reorganization which would take place in 1974, and that she should speak with Edwards concerning her new position under the reorganization. This position entailed more responsibility.

On August 17, plaintiff talked to Edwards about her lack of promotion rather than the planned reorganization and its likely effect on her responsibilities. Peper testified that Edwards told her that while her work was of excellent quality, he and others had some difficulty in working with her. Although dissatisfied with the lack of action toward her promotion, Peper continued working in the training section.

Peper's resignation was precipitated by an unrelated incident involving the temporary assignment of a male Administrative Officer from the Plasma Physics Plant to the Personnel Office for the period of time necessary for him to become familiar with the procedures there. The idea was to familiarize him with the central personnel office so he could more easily work with it during the reorganization, which apparently did not include the Plasma Physics Plant. Peper was offended by this — she somehow concluded that this man did not know his job but outranked her. Nothing in the record supports this contention.

Plaintiff resigned as of October 1, 1973, complaining of Barbour's July promotion to Administrative Officer and Edwards' comments about her. Reed reluctantly accepted her resignation, claiming that Edwards' views had nothing to do with her lack of promotion. After the 1974 reorganization, all four regional representatives were Administrative Officers.

Testimony by William Reed indicated that Mrs. Peper, while unhappy at not being promoted, had never indicated that she attributed her non-promotion to sex discrimination. He testified that she had never complained to him of such discrimination and that none of his co-defendants had ever informed him that plaintiff had made any such complaints to them. Peper admitted that the charge of sex dis-

crimination was wholly the product of her consultations with an attorney, which took place after her resignation.

Peper filed a complaint in the Superior Court, Law Division, on February 1, 1974, charging Princeton University as an entity and several of its officers individually with sex discrimination. Jurisdiction was alleged under twelve different theories. At the conclusion of plaintiff's trial presentation the defense moved for dismissal of the complaint as to all defendants, and in the alternative, as to the individual defendants. Disposition of the motion was deferred until the conclusion of defendant's case. At that time the trial judge granted the motion to dismiss as to the individual defendants. Disposition of the motion was deferred until Plaintiff objected to the dismissal of the complaint as to the individual defendants.

The trial judge ruled that plaintiff had failed to prove sex discrimination on the part of Princeton University with respect to the two specific alleged incidents of which she complained. Judgment dismissing her complaint was entered on June 4, 1976. On Peper's appeal, the Appellate Division reversed, 151 *N. J. Super.* 15 (1977). The appeals court held that the trial judge was correct in dismissing the complaint against the individual defendants but that the evidence proved sex discrimination on the part of Princeton University in not promoting Peper to the position of Administrative Officer on July 1, 1973. The court found the discrimination to be violative of New Jersey's Law Against Discrimination, *N. J. S. A.* 10:5-1 *et seq.* This Court granted the University's petition for certification, 75 *N. J.* 24 (1977).

I

## JURISDICTION

The principle is well established that a court cannot hear a case as to which it lacks subject matter jurisdiction even though all parties thereto desire an adjudication on the merits. *State v. Osborn,* 32 *N. J.* 117, 122 (1960) ; *Abbott*

*v. Beth Israel Cemetery Ass'n of Woodbridge*, 13 *N. J.* 528, 537 (1953); *Peterson v. Falzarano*, 6 *N. J.* 447, 454 (1951). Such jurisdiction must be granted to the court by the Constitution or by valid legislation, as it "cannot be vested by agreement of the parties." *Id.* Likewise, subject matter jurisdiction cannot be conferred by waiver resulting from a party's failure to interpose a timely objection to the assumption of jurisdiction. *Lay Faculty Ass'n of Regional Secondary Schools of Archdiocese of Newark v. Roman Catholic Archdiocese of Newark*, 122 *N. J. Super.* 260, supplemented 124 *N. J. Super.* 369 (App. Div. 1973), cert. den. 64 *N. J.* 153 (1973). Objection to jurisdiction of the court over the subject matter is effective whenever made. *McKeeby v. Arthur*, 7 *N. J.* 174 (1951). Of the 12 grounds of jurisdiction alleged by plaintiff, we find that only a few are colorable.

A

*Law Against Discrimination*

The University contends that prior to the June 6, 1977 effective date of the 1977 amendments to the Law Against Discrimination, *L.* 1977, *c.* 122, that Law did not apply to private[2] universities. The pre-amendment version of the Law's definitional section, which is applicable to Peper's suit, read as follows:

"Employer" does not include a club exclusively social or a fraternal, charitable, educational or religious association or corporation, if such club, association or corporation is not organized and operated for private profit.[3]

[*N. J. S. A.* 10:5–5(e)]

---

[2]Each reference herein to private universities *includes* only private non-profit universities. Profit-making institutions are clearly covered by the Law Against Discrimination.

[3]*L.* 1977, *c.* 122 amended the Law Against Discrimination so that private universities and clubs would be covered under *N. J. S. A.*

Despite the plain and unambiguous exclusion of private universities from the ambit of the Law, the Appellate Division concluded, without citing any supporting authority, that Princeton was an "employer" within the meaning of the Law Against Discrimination. 151 *N. J. Super.* at 23. The appeals court properly found the University to constitute a public accommodation under *N. J. S. A.* 10:5–5(*l*), which read, and still reads, in pertinent part that "[a] place of public accommodation shall include, but not be limited to * * * a college and university * * *" To prevent the alleged anomaly of having the Law Against Discrimination apply to Princeton as a public accommodation, but not as an employer, the Appellate Division found that the specific exclusion of universities from the definition of employer could not apply to any facility which was itself a public accommodation. *Id.* We disagree.

The prohibition of discrimination in relation to public accommodation is ·functionally distinct from the ban on employment discrimination. The former deals only with facilities maintained for the use of the general public. *See Blair v. Mayor and Council of Bor. of Freehold,* 117 *N. J. Super.* 415, 417 (App. Div. 1971), certif. den. 60 *N. J.* 194 (1972); *National Organization for Women v. Little League Baseball,* 127 *N. J. Super.* 522, 530–532 (App. Div. 1974), affirmed 67 *N. J.* 320 (1974). Thus, Princeton could not legally discriminate in making its facilities available as an

10:5–5(e) unless specifically exempted, elsewhere in the statute. No applicable exemption exists for private nonsectarian universities.

*N. J. S. A.* 10:5–5(e) as amended provides: ·

"Employer" includes all persons as defined in subsection (a) of this section unless otherwise specifically exempt under another section of this Act, and includes the State, any political or civil subdivision thereof, and all public officers, agencies, boards or bodies. Subsection (a) remains unamended and defines "person":

"Person" includes one or more individuals, partnerships, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries.

educator. The Legislature could rationally choose not to exempt a private university in that respect, but to accord the exemption as an employer. Thus, the Appellate Division erred in considering plaintiff's case as one falling under the statutory prohibition of discrimination in relation to public accommodation.

■In our view, the Appellate Division's holding effectively nullifies the specific exemption in *N. J. S. A.* 10:5–5(e) for private educational institutions as employers. A construction of a legislative enactment which would render any part thereof superfluous is disfavored. *Abbotts Dairies v. Armstrong,* 14 *N. J.* 319, 327–328 (1954); *Hoffman v. Hock,* 8 *N. J.* 397, 406–407 (1952). Moreover, despite the expansive general purpose of the Law Against Discrimination, announced in *N. J. S. A.* 10:5–4 to be that of making employment free from proscribed types of discrimination, a "civil right" in New Jersey, this Court may not ignore the plain meaning of the exemption of private educational institutions found in *N. J. S. A.* 10:5–5(e).

To put this problem in perspective, it is useful to view the history of the Law Against Discrimination. As originally enacted in 1945, *L.* 1945, *c.* 169, it had more limited coverage than it does at present. It is beyond dispute that the Law Against Discrimination was never intended to cover all differences in treatment of employees by employers. It has been amended over a dozen times as part of a gradual legislative response directed toward eliminating forms of discrimination not theretofore banned by statute. For example, sex discrimination was expressly proscribed for the first time in 1970, pursuant to *L.* 1970, *c.* 80.

While this Court has been scrupulous in its insistence that the Law Against Discrimination be applied to the full extent of its facial coverage, *see Zahorian v. Russell Fitt Real Estate Agency,* 62 *N. J.* 399 (1973); *Jackson v. Concord Co.,* 54 *N. J.* 113 (1969), it has never found such coverage to exist in the face of an unambiguous exclusion. By any fair read-

ing, *N. J. S. A.* 10:5–5(e) was just that — an unmistakable exclusion of private universities in their capacities as employers from the scope of the Law Against Discrimination.

Moreover, this view was also held by the Attorney General. In 1976 the Division on Civil Rights received a complaint from a Trong R. Chai asserting employment discrimination by Fairleigh Dickinson University. After a Division investigation resulted in a finding of probable cause, the Division's Director received a challenge to its jurisdiction. He solicited the opinion of the Attorney General on this question and was informed that the Division lacked jurisdiction to consider charges of discrimination against private universities pursuant to the Law Against Discrimination.[4] The Division accordingly closed its file and referred the complainant to the Equal Employment Opportunity Commission. These determinations all antedated the Appellate Division's decision in *Peper*. Chai took an appeal from the Division's action and a different panel of the Appellate Division expressed unanimous disagreement with the jurisdictional decision in *Peper*. However, it affirmed the dismissal of Chai's complaint by the Division on Civil Rights solely on the ground that the law, as it existed at the time of the dismissal, supported that action. *Chai v. Division on Civil Rights,* 160 *N. J. Super.* 176 (App. Div. 1977).

■■ In interpreting the meaning of a statute, this Court places great weight on the interpretation of legislation by

---

[4]The relevant text of the Attorney General's statement follows:

March 11, 1976

Dear Mr. Potter:

Please be advised that it is the determination of the Attorney General's office that private, non-profit colleges and universities are exempt as employers under the Law Against Discrimination pursuant to N. J. S. A. 10:5–5(e). Included within this exemption are Princeton, Fairleigh Dickinson and Seton Hall Universities as well as any other private, non-profit institution. Accordingly, any complaints against such schools should be closed for the reason that the Division lacks jurisdiction to proceed, and complainants should be advised to pursue federal remedies.

the administrative agency to whom its enforcement is entrusted. *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N. J.* 544, 575 (1978); *Service Armament Co. v. Hyland,* 70 *N. J.* 550, 561 (1976); *Passaic Daily News v. Blair,* 63 *N. J.* 474, 484 (1973). Where an agency has based its statutory interpretation on an opinion by the Attorney General, we have held that a court should attach weight to the Attorney General's opinion. *Safeway Trails Inc. v. Furman,* 41 *N. J.* 467, 483 (1964), app. dismissed, 379 *U. S.* 14, 85 *S. Ct.* 144, 13 *L. Ed.* 2d 84 (1964). We see no justification for deviating from these principles in this case.

Peper contends that the stated purposes of the 1977 amendments indicate that the Legislature believed that private universities were within the coverage of the Law Against Discrimination in its pre-amendment form. The statement of the sponsor of the amending legislation was as follows:

> . This bill will clarify some ambiguity in the present Law Against Discrimination. It will limit the present exemption from the provisions concerning employment discrimination to those cases where no governmental policy would be served by governmental regulation; specifically in cases of purely private social clubs and of religious organizations whose tenets require certain employment practices.

However, Peper fails to note that the statement of the Senate State Government, Federal and Interstate Relations and Veterans Affairs Committee attached to S.1608 indicated that the amendments removed a "blanket" exemption. More importantly, the views of the 1977 Legislature as to the meaning of *N. J. S. A.* 10:5–5(e) are not dispositive of the meaning ascribed to that section by the earlier Legislature which passed it. We have held that

> the question as to the intent of the Legislature that adopted the * * * statute is a judicial question as to which neither the action or inaction of a subsequent Legislature can be dispositive.
>
> [*Schmoll v. Creecy,* 54 *N. J.* 194, 203 (1969)]

We have no doubt that the Legislature which enacted the
original version of *N. J. S. A.* 10:5–5(e) intended a
"blanket" exemption of private universities in their capacity
as employers from the reach of the act. Thus, whatever
ambiguity the 1977 amendments removed, it did not concern
the coverage of private universities under the Law Against
Discrimination.[5]

Nor do we find merit in Peper's equal protection argu-
ments on this score. The statute's classification exempting
private universities from its coverage is rational, even though
it may not be laudable. It was perfectly reasonable to con-
clude in 1945 that given the total separation of the State
from private universities, there was no basis for regulating
them as comprehensively as public universities. Even today,
the limited use of State funds for scholarship or other
purposes by Princeton University is insufficient to brand that
institution as an arm of the State.[6] Thus, we can only
conclude that prior to the passage of *L.* 1977, *c.* 122, the
Law Against Discrimination did not apply to private
universities.

[5]It is also instructive to note that from 1965 until 1972 Title VII
of the Civil Rights Act of 1964, 42 *U. S. C.* § 2000e *et seq.*, did not
apply to educational institutions with respect to employees engaged
in educational activity. When the 1972 amendments to that Act,
*Pub. L.* 92–261, 86 *Stat.* 103, placed most institutions within the
jurisdiction of the Equal Employment Opportunity Commission, the
courts held that this newly expanded jurisdiction did not apply retro-
actively. Educational institutions were not covered for discrimina-
tion antedating the effective date of the amendments, March 24, 1972.
*See Cleveland Bd. of Ed. v. LeFleur*, 414 *U. S.* 632, 638–639 n. 8,
94 *S. Ct.* 791, 795–796, 39 *L. Ed.* 2d 52, 59–60 (1974); *Cohen v.
Illinois Institute of Technology*, 524 *F.* 2d 818, 822 n. 4 (7th Cir.
1975), *cert.* den. 425 *U. S.* 943, 96 *S. Ct.* 1683, 48 *L. Ed.* 2d 187
(1976); *Weise v. Syracuse University*, 522 *F.* 2d 397, 410–411 (2d
Cir. 1975); *Presseisen v. Swarthmore College*, 71 *F. R. D.* 34, 47–49
(E. D. Pa. 1976).

[6]The funds received by Princeton University for 1975–1976 from
the State of New Jersey totaled $581,377.00, hardly a significant
factor in its operating budget of $125 million dollars.

The Legislature may attack a problem one step at a time. *McGowan v. Maryland,* 366 *U. S.* 420, 425–426, 81 *S. Ct.* 1101, 1104–1105, 6 *L. Ed.* 2d 393, 399 (1961); *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 *U. S.* 483, 489, 75 *S. Ct.* 461, 465, 99 *L. Ed.* 563, 573 (1955); *David v. Vesta Co.,* 45 *N. J.* 301, 315 (1965); *Two Guys From Harrison, Inc. v. Furman,* 32 *N. J.* 199, 218–219, 229 (1960); *New Jersey Restaurant Ass'n v. Holderman,* 24 *N. J.* 295, 300–301 (1957). The constitutionality of a legislative classification is presumed and the one who assails it must carry the burden of showing its arbitrariness. *David v. Vesta Co., supra.*[7] This Court has held that the Law Against Discrimination did not violate equal protection strictures where it only proscribed discrimination in publicly assisted housing. *Levitt & Sons, Inc. v. Div. Against Discrimination, etc.,* 31 *N. J.* 514, 532–534 (1960), app. dismissed 363 *U. S.* 418, 80 *S. Ct.* 1257, 4 *L. Ed.* 2d 1515 (1960); *see also Jones v. Haridor Realty Corp.,* 37 *N. J.* 384, 393–394 (1962).

Only after many years of abstention has the government concluded that it has the right, power and duty to regulate private organizations. This court will not lightly conclude that distinctions in regulatory coverage bottomed on the inherent differences between state run and privately run institutions are so arbitrary as to violate either the Fourteenth Amendment or *New Jersey Const.* (1947) Art. I, para. 1. In fact, the determination that any private educational institution should be so regulated in its capacity as an employer came slowly. In their initial versions, neither Title VII, which scarcely covered educational institutions

---

[7]The assertion of Peper and *Amicus* Public Advocate that the State must show an appropriate governmental interest in permitting private universities to discriminate is erroneous. Equal protection strictures are not violated so long as the State can rationally justify less comprehensive regulation of private universities than of public ones.

at all, nor the Law Against Discrimination applied to most aspects of employment at private universities. The subsequent choice to subject them to the Law Against Discrimination was a valid policy determination by the Legislature. We thus see no reason to depart from the normal rule of statutory construction which holds that amendments to a statute are given prospective application only unless the changes are merely procedural or the Legislature specifically indicates otherwise. *Skulski v. Nolan,* 68 *N. J.* 180, 202 (1975); *Pennsylvania Greyhound Lines, Inc. v. Rosenthal,* 14 *N. J.* 372, 381 (1954). We hold that prior to the effective date of *L.* 1977, *c.* 122, June 6, 1977, the Law Against Discrimination did not apply to private universities in their capacity as employers.

## B

### *Title VII*

Wholly apart from her claim under the Law Against Discrimination, plaintiff sought to enforce her rights under federal law. Pursuant to Title VII of the Civil Rights Act of 1964, 42 *U. S. C.* § 2000e–2(a) (1) and (2), it is unlawful for an employer to discriminate with respect to compensation, terms, conditions or privileges of employment because of sex or to segregate or classify employees in such a way that sex could adversely affect an employee's status. Prior to the 1972 amendments to Title VII, 42 *U. S. C.* § 2000e–1 exempted from coverage of that Title any educational institution "with respect to the employment of individuals to perform work connected with the educational activities of such institution."[8] *Pub. L.* 92–261, § 3, effective

---

[8]Due to our disposition of this issue on a broader ground, we need not address the issue of whether Peper was an employee engaged in educational activities. If she was such an employee, only the second alleged discriminatory act would be cognizable as the first act occurred prior to the March 24, 1972 effective date of the amendments.

March 24, 1972, amended that section so that of all educational institutions, only sectarian educational institutions limiting the hiring of employees to persons of a particular religion to perform work connected with that institution are exempted.

Whether Peper is properly eligible to enforce her rights under Title VII in this action is a separate question. We conclude that 42 *U. S. C.* § 2000e–5(f) (3), which provides that "each United States District Court . . . shall have jurisdiction of actions brought under this subtitle" is not a grant of exclusive jurisdiction to the federal courts. The general rule is that state courts have concurrent jurisdiction with federal district courts over cases arising under the Constitution, laws or treaties of the United States, unless such jurisdiction of state courts is excluded by an express provision. *Dowd Box Co. v. Courtney,* 368 *U. S.* 502, 508, 82 *S. Ct.* 519, 523, 7 *L. Ed.* 2d 483, 487 (1962). Thus, state courts have concurrent jurisdiction with federal courts over Title VII actions. *Bennun v. Bd. of Governors of Rutgers, etc.,* 413 *F. Supp.* 1274, 1279 (D. N. J. 1976); *See also Endress v. Brookdale Comm. Coll.,* 144 *N. J. Super.* 109, 132 (App. Div. 1976); *Gray v. Serruto Builders, Inc.,* 110 *N. J. Super.* 297, 301 (Ch. Div. 1970).

We must, however, determine whether Peper, by virtue of bringing her action in state court, may escape the preconditions to the filing of a Title VII suit in federal court. It is not disputed that the filing of a charge with the Equal Employment Opportunity Commission as required by 42 *U. S. C.* § 2000e–5(e) is a jurisdictional prerequisite for bringing a Title VII case in federal court. *See United Airlines Inc. v. Evans,* 431 *U. S.* 553, 556, 97 *S. Ct.* 1885, 1888, 52 *L. Ed.* 2d 571, 577 (1977); *Wetzel v. Liberty Mutual Ins. Co.,* 508 *F.* 2d 239, 246 n. 8 (3 Cir. 1975), *cert.* den. 421 *U. S.* 1011, 95 *S. Ct.* 2415, 44 *L. Ed.* 2d 679 (1975); *Bowe v. Colgate-Palmolive Co.,* 416 *F.* 2d 711, 719 (7 Cir. 1969); *Bernstein v. National Liberty Intern. Corp.,* 407 *F. Supp.* 709 (E. D. Pa. 1976); *Presseisen v. Swarth-*

*more Coll.,* 386 *F. Supp.* 1337, 1341 (E. D. Pa. 1974); *Jones v. United Gas Improvement Co.,* 383 *F. Supp.* 420 (E. D. Pa. 1974).

██ Peper freely admits to purposefully avoiding her available administrative remedy through the EEOC. The trial judge correctly dismissed Peper's allegation of jurisdiction under Title VII for her failure to file a charge with the EEOC. To permit Peper to file a suit under Title VII without first filing a charge with the EEOC would give state courts greater jurisdiction than federal courts in enforcing the concededly federal rights secured by that statute. In *Alexander v. Gardner-Denver Company,* 415 *U. S.* 36, 47, 94 *S. Ct.* 1011–1019, 39 *L. Ed.* 2d 147, 157 (1974), the Supreme Court observed that one of the jurisdictional prerequisites under Title VII which an individual must satisfy before being entitled to institute a lawsuit is the filing of a timely charge of employment discrimination with the EEOC. In *United Airlines Inc. v. Evans, supra,* 431 *U. S.* at 556, 97 *S. Ct.* at 1888, 52 *L. Ed.* 2d at 577, the Supreme Court upheld a federal district court holding that the failure to file a charge within the 90 days allotted by 42 *U. S. C.* § 2000e–5(d)[9] "foreclosed and relief under Title VII." This would seem to include relief in state courts.

More importantly, to permit a plaintiff to file suit under Title VII and to appear before any judicial tribunal without first resorting to the specially created administrative remedy of proceedings before the EEOC would run directly counter to the intent of Congress.

It is a jurisdictional prerequisite to the filing of a suit under Title VII that a charge be filed with the EEOC against the party sought

---

[9]Prior to the 1972 amendments to Title VII, a prospective plaintiff was required to file a charge with the EEOC within 90 days after the alleged unlawful employment practice occurred. The limitations section in the amended version of Title VII is redesignated 42 *U. S. C.* § 2000e–5(e) and has been increased to 180 days.

to be sued. 42 U. S. C. Sec. 2000e–5(e). This provision serves two important purposes. First, it notifies the charged party of the asserted violation. Secondly, it brings the charged party before the EEOC and permits effectuation of the Act's primary goal, the securing of voluntary compliance with the law.

> [*Bowe v. Colgate-Palmolive Co.,*
> *supra*, 416 *F*. 2d at 719]

See *EEOC v. Westvaco Corp.*, 372 *F. Supp.* 985, 992–994 (D. Md. 1974); *Sciaraffa v. Oxford Paper Co.*, 310 *F. Supp.* 891, 897 (D. Me. 1970); *Antonopulos v. Aerojet-General Corp.*, 295 *F. Supp.* 1390, 1393 (E. D. Cal. 1968). Since the 1972 amendments to Title VII, the EEOC itself has had the right to bring suit. However, that right is conditioned on its first attempting to resolve matters through conciliation. Where the EEOC has attempted to skip the conciliation step, its circumvention of the statute has been judicially rebuffed by dismissal of its suit. *See Patterson v. American Tobacco Co.*, 535 *F.* 2d 257, 272 (4 Cir. 1976), *cert.* den. 429 *U. S.* 920, 97 *S. Ct.* 314, 315, 50 *L. Ed.* 2d 286 (1976); *EEOC v. Hickey-Mitchell Co.*, 507 *F.* 2d 944, 947–948 (8 Cir. 1974); *EEOC v. E. I. DuPont de Nemours & Co.*, 373 *F. Supp.* 1321, 1333–1334 (D. Del. 1974); *EEOC v. Westvaco Co., supra.*

Thus, this Court is left with a purported Title VII claim which could not be brought in federal court because the plaintiff has purposefully ignored one of the primary policies behind the Act. We hold that our state courts lack jurisdiction over a Title VII claim as to which the plaintiff has not filed a timely charge before the EEOC and fulfilled the other requirements under that Act which are prerequisites to bringing suit in federal court.

## C

### *The State Constitution*

 Both the majority and the dissent in *King v. So. Jersey Nat. Bank*, 66 *N. J.* 161, 177, 193–194 (1974), con-

cluded that this Court has the power to enforce rights recognized by the New Jersey Constitution, even in the absence of implementing legislation. *See Robinson v. Cahill,* 62 *N. J.* 473 (1973) *cert.* den. *sub nom. Dickey v. Robinson,* 414 *U. S.* 976, 94 *S. Ct.* 292, 38 *L. Ed.* 2d 219 (1974); *Cooper v. Nutley Sun Printing Co., Inc.,* 36 *N. J.* 189, 196 (1961); *Gray v. Serruto Bldrs., Inc.,* 110 *N. J. Super.* 297, 306 (Ch. Div. 1970); *cf. Opinion of the Justices,* 287 *Ala.* 337, 251 *So.* 2d 755 (1971). As Chief Justice Hughes rightly pointed out:

Just as the Legislature cannot abridge constitutional rights by its enactments, it cannot curtail them through its silence, and the judicial obligation to protect the fundamental rights of individuals is as old as this country.

[66 *N. J.* at 177]

With this in mind, we must consider Peper's claim that the New Jersey Constitution prohibits sex discrimination in employment. Art. I, para. 1 provides that

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness.

In New Jersey, the right to obtain gainful employment and to use the fruits of such labor to acquire property has traditionally been considered basic.

The common law has long recognized as a part of the boasted liberty of the citizen the right of every man to freely engage in such lawful business or occupation as he himself may choose, free from hindrance or obstruction by his fellow-men, saving such as may result from the exercise of equal or superior rights on their part — such, for instance, as the right of fair competition in the like field of human effort — and saving, of course, such other hindrance or obstruction as may be legally excused or justified.

This right is declared by our constitution to be unalienable. The first section of the Bill of Rights sets forth that "All men are by nature free and independent, and have certain natural and unalien-

able rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protection property, and of pursuing and obtaining safety and happiness." [The quoted segment is Art. I, para. 1 of the *N. J. Const.* (1844).]

As a part of the right of acquiring property there resides in every man the right of making contracts for the purchase and sale of property, and contracts for personal services, which amount to the purchase and sale of labor. It makes little difference whether the right that underlies contracts of the latter sort is called a personal right or a property right. It seems to us impossible to draw a distinction between a right of property and a right of acquiring property that will make a disturbance of the latter right any less actionable than a disturbance of the former. In a civilized community which recognizes the right of private property among its institutions, the notion is intolerable that a man should be protected by the law in the enjoyment of property once it is acquired, but left unprotected by the law in his efforts to acquire it. The cup of Tantalus would be a fitting symbol for such a mockery. Our constitution recognizes no such notion.

> [*Brennan v. United Hatters of North America, Local No. 17*, 73 *N. J. L.* 729, 742–743 (E. & A. 1906)]

The above quoted words of Justice Pitney referred to the 1844 Constitution, Art. I, para. 1. They have been cited with approval on numerous occasions. *See Kingston Trap Rock Co. v. International Union*, 129 *N. J. Eq.* 570, 577–579 (E. & A. 1941); *Cameron v. International Alliance*, 118 *N. J. Eq.* 11, 22–23 (E. & A. 1934); *see also Carroll v. Local No. 269, International Brotherhood of Electrical Workers*, 133 *N. J. Eq.* 144, 146 (Ch. Div. 1943); *Joseph v. Passaic Hospital Ass'n*, 38 *N. J. Super.* 284, 291 (App. Div. 1955) certif. den. 20 *N. J.* 535 (1956). Under our recent 1947 Constitution women were granted rights of employment and property protection equal to those enjoyed by men. This was accomplished by changing the first two words of Art. I, par. 1 from "All men" to "All persons."

In contemporary times, old stereotypes of the man as breadwinner and the woman as housekeeper have broken down, and the right of personal autonomy has come to the forefront. Thus, in *Tomarchio v. Township of Greenwich*, 75 *N. J.* 62 (1977), this Court clearly articulated the prem-

ise that sex based presumptions may not be used to deny women rights equal to those accorded men in the area of employment:

It is impermissible to employ gender-based distinctions premised upon "archaic and overbroad" stereotypes regarding the economic dependency of women and thus to deny a female wage earner protection for her family equal to that afforded a comparable male wage earner. [75 *N. J.* at 73]

While the *N. J. Const.* (1947), like its 1844 predecessor, has no specific equal protection clause analogous to that in the Fourteenth Amendment, our State Constitutions have been construed to provide analogous or superior protections to our citizens. In fact, Art. I, para. 1 has been the most frequently referred to as the basis of our Constitution's equal protection guarantees. *See Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp.,* 71 *N. J.* 249, 285 (1976); *So. Burlington Cty. N.A.A.C.P. v. Tp. of Mt. Laurel,* 67 *N. J.* 151, 174–175 (1975), *Robinson v. Cahill, supra,* 62 *N. J.* at 482; *Bailey v. Engelman,* 56 *N. J.* 54, 55 (1970); *General Public Loan Corp. v. Director, Div. of Taxation,* 13 *N. J.* 393, 401 (1953); *Washington Nat. Ins. Co. v. Board of Review of N. J. Unemployment Compensation Commission,* 1 *N. J.* 545, 554 (1949). These rights are fundamental guarantees of our Constitution.

the equal protection of the laws means that no person or class of persons shall be denied the protection of the laws enjoyed by other persons or classes of persons in their lives, liberty and property, and in the pursuit of happiness, both as respects privileges conferred and burdens imposed.

[*Washington Nat. Ins. Co. v. Board of Review, supra,* 1 *N. J.* at 553]

If Peper was not promoted because she was a woman, she was denied the same right to acquire property that is guaranteed males under Art. I, para. 1. The right to acquire property would be a hollow one indeed if it did not protect individuals from being invidiously denied the op-

portunity to obtain the means necessary to acquire that property. In most jobs, rank and salary scales are intimately related. Surely the opportunity to receive fair consideration for a promotion is inextricably tied to Peper's ability to acquire property. Since Art. I, para. 1 specifically protects the rights of all persons to acquire property, the necessity of permitting Peper to vindicate this basic right is self-evident. We hold that Peper has stated a cause of action under *N. J. Const.* (1947), Art. I, para. 1. Thus, this Court has jurisdiction to reach the merits.

## II

## *THE MERITS*

Employment discrimination due to sex or any other invidious classification is peculiarly repugnant in a society which prides itself on judging each individual by his or her merits. New Jersey has always been in the vanguard in the fight to eradicate the cancer of unlawful discrimination of all types from our society. We have had a law against discrimination since 1954 — some twenty years before the effective date of Title VII.

However, the existence of a strong policy against employment discrimination in New Jersey does not affect the normal rule that the burden of proof by a preponderance of the evidence is with the complaining party even where invidious discrimination is alleged. *Jackson v. Concord Co., supra,* 54 *N. J.* at 119 (1969) ; *Jones v. College of Med. & Dent. of New Jersey, Rutgers,* 155 *N. J. Super.* 232, 238 (App. Div. 1978) certif. den. 77 *N. J.* 482 (1978). Defining the burden a plaintiff must meet to establish a *prima facie* case of discrimination is a delicate task. Acts of unlawful employment discrimination are more difficult to prove than are any other proscribed acts of discrimination. No employer lists his qualifications for promotion as explicitly excluding persons of a particular sex. Furthermore, the higher the job level the more difficult the proof, as matters of personality

and the subjective judgment of immediate superiors become determinative. Thus, the standard for presenting a *prima facie* case cannot be too great lest rampant discrimination go unchecked. On the other hand, the requirement that a *prima facie* showing of discrimination be made cannot be so easily surmountable that any time a member of one sex in a job traditionally held by members of the opposite sex is not promoted, he or she necessarily has made out a *prima facie* case of discrimination. Such a rule might encourage promotion of unqualified employees by employers who seek to avoid the burdens of litigation, causing dissatisfaction among other employees and reduced productivity.

Since the only basis of jurisdiction in this case is grounded in state law, we must determine the appropriate standards to be applied in discrimination cases based on an alleged violation of a state statute or constitutional provision. Of course, where state law is involved, the test for a *prima facie* case of discrimination need not be the same as that used in the federal cases arising under Title VII. However, where these standards are useful and fair, it is in the best interests of everyone concerned to have some uniformity in the law. Under Title VII, the United States Supreme Court has recognized two separate theories of relief: 1) disparate treatment and 2) disparate impact.

"Disparate treatment" such as alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. See, e. g., Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U. S. 252, 265–266, 97 S. Ct. 555, 50 L. Ed. 2d 450. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involves employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and

cannot be justified by business necessity. See infra, at 1861. Proof of discriminatory motive, we have held, is not required under a disparate impact theory. Compare, e. g., Griggs v. Duke Power Co., 401 U. S. 424, 430–432, 91 S. Ct. 849, 28 L. Ed. 2d 158, with Mc-Donnell Douglas Corp. v. Green, 411 U. S. 792, 802–806, 93 S. Ct. 1817, 36 L. Ed. 2d 668.

> [*Int'l Brotherhood of Teamsters v. United States*, 431 U. S. 324, 335, 336, 97 S. Ct. 1843, 1854–1855 n. 15, 52 L. Ed. 2d 396, 415 n. 15 (1977)]

The instant case is concerned solely with disparate treatment.[10]

■ Both parties agree that *McDonnell-Douglas Corporation v. Green*, 411 U. S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) has announced the proper test for a *prima facie* case. *McDonnell-Douglas* was a Title VII case wherein the critical issue concerned "the order and allocation of proof in a private, non-class-action challenging employment discrimination." 411 U. S. at 800, 93 S. Ct. at 1823, 36 L. Ed. 2d at 676. The specific wording of the holding applied to racial minorities.

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
> [411 U. S. at 802, 93 S. Ct. at 1824, 36 L. Ed. 2d at 677 (footnote omitted)]

However, the tests are equally applicable to other forms of employment discrimination, such as discrimination against

---

[10]While Peper did assert that Reed asked her to perform certain assignments for him so that he would become better acquainted with her work, these tasks were clearly of a nature which the training section would handle. There was no evidence indicating that women employed by Princeton are generally required to pass tests, or to do any other tasks not required of men, as a precondition of promotion.

females on the basis of sex. *See Meyer v. Mo. State High-way Commission,* 567 *F.* 2d 804, 808 (8 Cir. 1977) *cert.* den. 435 *U. S.* 1013, 98 *S. Ct.* 1888, 56 *L. Ed.* 2d 395 (1978).

██ Assuming that plaintiff meets these requirements, the burden shifts to defendant to come forward with a legitimate nondiscriminatory reason for the employee's rejection. *Id.* 411 *U. S.* at 802, 93 *S. Ct.* at 1824, 36 *L. Ed.* 2d at 678. If the defendant does satisfy the burden, the plaintiff is permitted to come forward with evidence indicating that the nondiscriminatory reason was no more than a pretext to hide discriminatory activity or was discriminatorily applied. *Id.* 411 *U. S.* at 804–805, 93 *S. Ct.* at 1825–1826, 36 *L. Ed.* 2d at 679.

██ While we commend the *McDonnell-Douglas* standards to our trial courts as a starting point in actions brought under the Law Against Discrimination or any other State proscription against discrimination, it must be emphasized that these tests are to be used only where and to the extent that their application is appropriate. For example, the fourth test would have no applicability whatsoever to Peper's complaint of being denied an in-place promotion in 1973. In *McDonnell-Douglas,* by a footnote directly following the enumerated standards for a *prima facie* case, the Supreme Court recognized the utter futility of setting out any one formula for all Title VII cases:

> The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.
>
> [411 *U. S.* at 802 n. 13, 93 *S. Ct.* at 36 *L. Ed.* 2d at 677–678]

*See also Jones v. College of Med. & Dent. of New Jersey, Rutgers, supra,* 155 *N. J. Super.* at 237. In *Johnson v. Univ. of Pittsburgh,* 435 *F. Supp.* 1328 (W. D. Pa. 1977), a tenure case, the court ignored the fourth test of *McDonnell-Douglas.* Instead, it held that if plaintiff could prove that

male "persons of less qualifications were hired and jumped over her head and given promotions and tenure when under the up or out system she was being terminated," she had stated a cause of action. 435 *F. Supp.* at 1360. Thus, where the *McDonnell-Douglas* elements are not particularly helpful, we see no harm in the trial court's addressing the question of whether failure to promote the complaining employee was the product of a legitimate business consideration rather than proscribed discrimination.

The gist of *McDonnell-Douglas* is that an employee who is a member of a protected group and who is qualified for hiring or promotion may not be rejected for any reason other than the fact that another seemingly qualified individual was selected for some non-invidious reason. We agree with the observations of Judge Campbell in his dissent in *Blizard v. Fielding,* 572 *F.* 2d 13 (1 Cir. 1978), that higher level employees do not fit neatly into the *McDonnell-Douglas* analysis.

My point is simply that there is much to say, in a case like this, for focusing upon the key issue — whether or not defendant had a proper reason for not promoting plaintiff — rather than floundering about with the difficult but inconclusive question of whether or not a prima facie case was made.

For all practical purposes, this was what was done here. It is true that the court did not preface its findings of non-discrimination with the words, "Assuming plaintiff has made out a prima facie case . . ." but it did carefully examine the substantiality of defendant's reasons for non-promotion, concluding that they were valid and non-discriminatory. In so doing, it inferentially recognized that the burden of proof rested with defendant. Since the principal effect of a prima facie case is to shift the burden of proof, and since the district court necessarily recognized the location of the burden in its handling of the evidence, I think its failure to articulate the *McDonnell-Douglas* formula was harmless.

[572 *F.* 2d at 16]

We conclude that in the context of this suit, Peper's burden of demonstrating a *prima facie* case required her to show that similarly situated males were promoted while she was not. By "similarly situated" we mean those persons

possessing equivalent qualifications and working in the same job category as plaintiff. It would be impossible to list all the criteria that are included in qualifications for promotion in all jobs. However, in the context of this case, we would certainly include educational level, job experience and, most importantly, the quality of work performed as relevant qualifications. By same job category we mean that Peper and those whom she claimed were illegally preferred over her must have been in the same "promotional stream," with similar responsibilities. Of course, we do not mean to suggest that these aspects of "similarly situated" status are exhaustive or of equal significance in differing employment contexts. The trial judge will have to make a sensitive appraisal in each case to determine the most relevant criteria.

Here, Peper was not "similarly situated" within the meaning of that concept as described above. She requested and accepted a transfer to the training section on July 7, 1972. Plaintiff several times indicated that she was there to broaden her horizons and did not expect promotion during this one to two year stay. Thus, she was not really in the normal stream of promotion while in that section. In July 1973 Mignon was promoted in the Wage and Salary section after being there for over three years.[11] At the same time Barbour was promoted in the Employment section — his first promotion in that section in four years. While on temporary assignment in the Training section, Peper was not really a peer of Mignon and Barbour. Furthermore, when

---

[11] The Appellate Division opinion, 151 *N. J. Super.* at 19, presents an erroneous picture by implying that Mignon was transferred to the wage and salary section in 1971 and concluding that it had just recently become busier. He was in fact transferred in 1969 and was there for three years before his superiors determined that the training section could use a second administrative employee — plaintiff. Oliver's original hiring was triggered by Mignon's transfer, as the transfer created an opening in the employment section. His subsequent promotion was wholly unrelated to that transfer.

their promotions were announced, she had been in that section only eight months.

We sympathize with Peper's frustration at not being promoted. However, before we can legitimately find her employer's conduct towards her to constitute discrimination on the basis of sex, a more persuasive showing must be made that the decision not to promote her was based upon something other than a *bona fide* evaluation of her qualifications for the position. This Court will not countenance proscribed acts of discrimination by any employer. Where the evidence warrants a finding of unlawful discrimination, we shall not hesitate to mandate the full scope of remedial relief necessary to make its victim whole. *See Jackson v. Concord Co., supra,* 54 *N. J.* at 126–128.

■ The finding of the trial judge that Peper was not promoted because she had removed herself from consideration by voluntarily transferring to the Training section is supported by substantial evidence. Her understanding was that she would remain in that section for one to two years. She resigned after being there for 15 months. As later events indicated, had Peper heeded Reed's advice to be patient, she would have had both her promotion and added responsibility by July 1, 1974, the date of official implementation of the University reorganization plan.[12] Since she entered the Training section in July 1972, Princeton kept its word to her. She would have been out of the Training section within two years. Moreover, the Appellate Division acted improperly in overturning a trial judge's decision which was amply supported by the evidence. *State v. Johnson,* 42 *N. J.* 146, 162 (1964).

■ We agree with both lower courts that Peper has not proven her claim that she was discriminatorily denied pro-

---

[12]Under Plan A, any regional representative who was not already an Administrative Officer was promoted to that level. Since Peper was slated to be one of the four regional representatives, she would have been promoted at that time.

motion to the position of Assistant Director of the Employment section, which was vacated by Edwards in September 1972. As both courts found, there was simply no opening for that position. Despite being named Associate Director of the Personnel Office, Edwards continued to perform the duties associated with his old office. Peper was told that there would be no opening for Assistant Director until the reorganization in 1974. Since she resigned in October 1973, she was not in a position to be considered for that job.

In evaluating the treatment of an employee in a particular case, we must be mindful that judicial intervention in the private employment context has a limited purpose. Antidiscrimination laws do not permit courts to make personnel decisions for employers. They simply require that an employer's personnel decisions be based on criteria other than those proscribed by law. Our courts will be vigilant in enforcing the rights against employment discrimination guaranteed employees by state and federal law where an employer's conduct is shown to be violative thereof. However, in the unique circumstances of this case, Peper has failed to carry her burden of proof to show by a preponderance of the evidence that her lack of promotion was the product of invidious discrimination against her on the basis of her sex.

In view of the foregoing, we reverse the judgment of the Appellate Division and reinstate the trial court's judgment in favor of Princeton University.

*For reversal and reinstatement*—Chief Justice HUGHES, Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER and Judge CONFORD—7.

*For affirmance*—None.