George J. TZANNETAKIS, Plaintiff,

v.

SETON HALL UNIVERSITY, Bernhard W. Scholz, Mark Rocha, Peter G. Ahr, John H. Shannnon, Delores Martin, Monsignor Robert Sheeran, Joan Coll, Karen Boroff, Richard Ognigene, And Sheldon Epstein, Defendants.

No. 01–CV–873.

United States District Court, D. New Jersey.

Oct. 26, 2004.

William M. Tambussi, Brown & Connery, LLP, Westmont, NJ, for Plaintiff.

Tricia B. O'Reilly, Marc D. Haefner, Connell Foley LLP, Roseland, NJ, for Defendants.

## OPINION

MARTINI, District Judge.

This matter comes before the Court on defendant Seton Hall University's ("SHU's") motion for summary judgment seeking to dismiss plaintiff's complaint. Plaintiff opposes the motion.[1] This Court adjudicates the matter on the papers. Fed.R.Civ.P. 78. For the reasons stated below, SHU's motion for summary judgment is **GRANTED,** and plaintiff's complaint is **DISMISSED** in its entirety.

## I. BACKGROUND

This is an employment discrimination and retaliation case brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5–1 *et seq.* Plaintiff George Tzannetakis claims that SHU discriminated and retaliated against him because of his Greek national origin and Orthodox religion. Generally speaking, plaintiff alleges that he was discriminated or retaliated against when he was denied the position of chairperson of the Economics Department in 1996, and when he was sanctioned for smoking in his office in 1999.

Plaintiff began his employment at SHU in 1963 as an economics professor in the Economics Department of SHU's School of Business. Over the course of plaintiff's tenure at SHU, which continued until around 1999, plaintiff was elected by members of the Economics Department as their chairperson for seven consecutive terms, each term lasting 3 years, from 1976 until 1996. A chairperson was the leader of a department. He or she was responsible for implementing changes in that department, and was required to be responsive to the directions of the dean of that school and the provost of the university. Among many other responsibilities, a chairperson was required to submit an annual report to the dean of his or her respective school, describing in detail student enrollment, curricula, publications and research activities of the faculty, and any other subjects on which the Dean sought to be informed. Plaintiff successfully acted as chairperson for the Economics Department until the 1990s, when he clashed with his supervisors and was denied the position as chair.

In early 1995, plaintiff voiced his concern that John Shannon, Dean of the School of Business, was wrongfully and without authority engaging in the process of evaluating faculty members. In a February 14, 1995 letter, plaintiff wrote to the Chair of the Faculty Guide Committee commenting on the "uninvited involvement and participation of the Dean's office to the process of 'faculty evaluations.'" (Pl.'s Ex. 6 at 1). It was plaintiff's understanding that sole authority to evaluate faculty members resided with the chairperson of each department. Although the Faculty Guide Committee rejected plaintiff's challenge to Dean Shannon's authority, this skirmish over authority was but a precursor of what was to occur in 1996.

On April 26, 1996, the election for chairperson of the Economics Department was held. Plaintiff was nominated by his peers and he accepted the position. On May 9, 1996, Dean Shannon sent a memorandum to all chairpersons setting forth a detailed

1. Initially, the motion for summary judgment was brought on behalf of SHU and three individual professors who had also been named as defendants in this action. In plaintiff's opposition brief, plaintiff conceded that the individuals are not liable (Def.'s Opp. Br. at 12 n. 4) and, therefore, SHU is the only remaining defendant for purposes of this motion.

list of what he expected to be included in their annual reports. One requirement was that the chairs had to submit evaluations for tenured and non-tenured faculty members of their department. Plaintiff considered the directive to be "an uninformed, misguided and incompetent letter" that exceeded the Dean's authority and was meant to turn the plaintiff into a "hatchet man" for eliminating foreign-born faculty. (Def.'s Ex. 5 at 335:21–336:7).

On June 12, 1996, plaintiff submitted his 1995–96 annual report to Dean Shannon on behalf of the Economics Department. That report did not address all of Dean Shannon's requirements contained in his May 9, 1996 memorandum. Notably, plaintiff refused to evaluate the performance of both non-tenured and tenured faculty members of his department. Harkening back to his position in 1995, plaintiff refused to submit evaluations because he believed the Dean lacked the authority to ask for them.

Plaintiff's report did however mention concerns about discrimination against foreign-born faculty. It stated in relevant part:

> Another matter of great concern to this department is the fact that in the past year half of the faculty filed grievances and/or addressed complaints alleging ethnic and/or racial discrimination. . . . At a University which has a stated objective for achieving diversity and a policy against ethnic and racial discrimination, the faculty would be expected to feel more comfortable than at other institutions. Since a hostile work environment adversely affects human health and productivity, the administration of this School and University must uncover the causes and act promptly to effect a lasting remedy. (Pl.'s Ex. 9 at 13).

In response to plaintiff's incomplete annual report, on June 28, 1996, Dean Shan-

non recommended by letter to Bernhard Scholz, Provost of SHU, that plaintiff's election as chairperson not be approved. As Provost, Scholz had the final say over plaintiff's election. Dean Shannon informed him that plaintiff had submitted an incomplete report by not providing all of the information requested in the May 9, 1996 memorandum. He stated that he spoke with plaintiff about the report's deficiencies, and plaintiff had responded by stating that he, as chairperson, was not required to provide the Dean with that information. Dean Shannon also cited problems with the Economics Department under plaintiff's leadership, including a decline in graduate and undergraduate enrollment, the paucity of publications by department members, and his resistance to the Dean's efforts to improve the school. The Dean concluded his letter by stating that he found plaintiff's "performance as chairperson is severely lacking," and that new leadership was necessary for the ailing department. (Pl.'s Ex.10 at 3).

On June 28, 1996, Provost Scholz sent plaintiff a letter stating that pursuant to the Faculty Guide, he did not approve of plaintiff's election as chairperson. Shortly after Scholz's disapproval, on its own initiative, the Economics Department appointed an acting chairperson until it could conduct a second election. That second election took place in September of that year. Despite knowing of the Provost's disapproval of plaintiff as chairperson, the faculty of the department nominated plaintiff for chair a second time. Even though he could have declined the nomination, plaintiff chose to accept the nomination and was once again elected as chairperson.

Provost Scholz again disapproved of plaintiff's election, precluding him from becoming the chairperson. And since plaintiff knowingly accepted the nomination when Scholz had disapproved of his elec-

tion, Scholz imposed the following sanctions for two years: plaintiff was ineligible for any faculty support for travel and research assistance; he was prohibited from teaching winter or summer session classes; and he was denied any requests for sabbatical.

On July 7, 1997, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") regarding the chair incident. He alleged that he was discriminated against because of his national origin and religion, and retaliated against because he had complained about discriminatory treatment of faculty members. The EEOC would not issue a determination until approximately two years later.

Before the determination issued, plaintiff was back on the administration's radar, not because of the chair position, but because of his pipe smoking. On November 11, 1998, Professor Joan Coll complained to the new Dean of the Business School, Delores Martin, about plaintiff smoking in Kozlowski Hall, the building where the professors of the Economics Department held class and where their offices were located. Coll had a respiratory problem that led her to be sensitive to people smoking. As a result, she complained frequently about faculty members that smoked. Coll had been complaining about plaintiff's smoking since the early 1990s.

Dean Martin spoke to plaintiff about Coll's most recent complaint. She also spoke with the Director of Human Resources and asked that the No Smoking Policy be reissued. Martin then took the reissued policy and gave it to plaintiff, asking whether plaintiff had seen it. He answered that he had.

Subsequently, the Dean's office continued to receive complaints about plaintiff's smoking. After one such complaint, Dean Martin once again went and spoke with plaintiff about his smoking. She approached him as he was leaving his office, and saw that he had his pipe in his shirt pocket with smoke rising out of his pocket. Although plaintiff denies that he was smoking in his office, alleging that he had been smoking outside, he does not deny that smoke was in fact emanating from his pipe at the time Martin addressed him about his smoking in the building.

On May 17, 1999, Professor Coll e-mailed Dean Martin again complaining that plaintiff was smoking and that this time he had caused her to have a sore throat. That e-mail was forwarded to Human Resources accompanied by a message from Dean Martin that she had "had many previous complaints regarding Dr. Tzannetakis's smoking in the building." (Pl.'s Ex. 29). Dean Martin also inquired what should be done about the situation.

On August 6, 1999, the EEOC issued a determination letter concluding that the actions of SHU concerning the chair incident established reasonable cause that a violation of Title VII had taken place. It is unclear who at SHU received that letter. What is clear is that there is no evidence that Dean Martin, Associate Dean Karen Boroff, or Professor Coll saw or were aware of that letter.

On September 1, 1999, the second incident giving rise to this lawsuit occurred. That day plaintiff was accused of smoking in his office in violation of the SHU No Smoking Policy by, once again, Professor Coll. Coll and plaintiff had a verbal confrontation about his smoking, after which she went directly to Dean Martin's office to complain. Dean Martin was preoccupied by a telephone call, so Coll spoke to Associate Dean Boroff about what happened. Boroff then asked Professor David Rosenthal, who had been in Boroff's office when Coll arrived, to investigate whether

he could smell smoke outside of plaintiff's office. Rosenthal reported to both Martin and Boroff that he did in fact smell smoke outside plaintiff's office.

On September 3, 1999, Dean Martin sent plaintiff a memorandum entitled "Continued Violations of Official University Policies." (Pl.'s Ex. 37). That memo begins by stating that Martin had received many complaints about plaintiff's smoking in the past and that she had in fact spoken with plaintiff about his smoking and the school's No Smoking Policy. It then goes on to describe the events of September 1, her investigation into the matter, and, based on all of the information available to her, her conclusion that there was sufficient evidence to find that plaintiff was smoking in his office. Consequently, she sanctioned plaintiff as follows: plaintiff was to vacate his office; plaintiff was not to enter Kozlowski Hall unless it was to teach a class; and plaintiff was to hold office hours somewhere on campus other than Kozlowski Hall.

On September 7, 1999, plaintiff filed a grievance with the school against Coll and Martin, complaining about the sanctions that he argued were unjustly imposed. Around September 22, plaintiff met with Associate Provost Paul Barnas and Dean Martin as part of the grievance procedure. During that meeting, he was asked to sign a form acknowledging that he read and would abide by the No Smoking Policy. He refused, proclaiming that the document constituted harassment and discrimination. Finally, on October 15, Provost Mark Rocha sent a letter to plaintiff denying his grievances, but lifting the sanctions against him.

On September 7, 2000, plaintiff filed a second charge of discrimination with the EEOC, alleging that he was retaliated against in the smoking incident for the issuance of the EEOC's determination letter in August 1999. On November 16, 2000, the EEOC issued a Notice of Right to Sue letter with respect to the chair incident. On February 13, 2001, the EEOC issued a Notice of Right to Sue letter with respect to the smoking incident.[2] The next day, February 14, plaintiff filed his complaint against SHU and numerous individual defendants starting this action. Plaintiff later amended his complaint.

On January 23, 2002, Judge Faith Hochberg dismissed portions of plaintiff's amended complaint. Subsequently, the case was reassigned to me. All that remains is the discrimination and retaliation claims against SHU arising from the chair and smoking incidents. Defendant then filed a motion for summary judgment seeking dismissal of those remaining claims. That motion is now before the Court.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment eliminates unfounded claims without resorting to a costly and lengthy trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex*, 477

---

**2.** The EEOC also found that there was no reasonable cause to believe that a violation

had taken place with regards to the smoking incident.

U.S. at 323, 106 S.Ct. 2548. A litigant may discharge this burden by exposing "the absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976).

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law determines which facts are material. *Id.* at 248, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* No issue for trial exists unless the nonmoving party can demonstrate sufficient evidence favoring it such that a reasonable jury could return a verdict in that party's favor. *Id.* at 249, 106 S.Ct. 2505.

## B. *Plaintiff's National Origin Discrimination Claims*

Title VII and NJLAD prohibit all discrimination in employment, including that which is based upon national origin. Discrimination claims under Title VII and NJLAD are analyzed according to the burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green,* 411

U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994); *Peper v. Princeton Univ. Bd. of Trustees,* 77 N.J. 55, 81–84, 389 A.2d 465 (1978) (adopting the *McDonnell Douglas* burden-shifting framework for analysis of NJLAD cases).

■ First, plaintiff has the burden of production, by a preponderance of the evidence, to make out a *prima facie* case of discrimination based on national origin. Plaintiff must show (1) that he is within a protected group; (2) that he was qualified for the position in question; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for plaintiff's termination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.[3] The defendant "satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes,* 32 F.3d at 763. The defendant "need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.*

Once the defendant satisfies its "relatively light burden," the burden shifts back to the plaintiff who must then show that the defendant's proffered reason or rea-

---

**3.** Despite this shift of the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plain-

tiff." *Tex. Dep't Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

sons are a pretext for discrimination. *Id.* The plaintiff can accomplish this by "pointing to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the [defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the" defendant's action. *Id.* at 764. The plaintiff cannot undermine the defendant's legitimate reasons by simply showing that the defendant's "decision was wrong or mistaken." *Id.* at 765. Instead, the plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.' " *Id.*

Therefore, the Court first analyzes whether plaintiff satisfied his burden to adduce a *prima facie* case under Title VII and NJLAD. It is not disputed that plaintiff satisfies elements one, three and four. Consequently, plaintiff's *prima facie* case hinges on whether or not plaintiff can make a satisfactory showing of the second element.

■ With regard to the second element, Plaintiff adduces sufficient evidence demonstrating that he was qualified for the position. He held a doctorate degree in economics. He was a tenured faculty member who worked at SHU for over 30 years. He was elected chairperson for 7 straight terms, from 1976 to 1996. SHU's argument that plaintiff was not qualified because he did not perform some of his duties as chairperson is misguided. Failing to perform one's duties is different than not being capable of fully and adequately performing those duties. Since defendant does not argue that plaintiff was incapable of performing his duties as chairperson, its argument is not relevant

to whether plaintiff was qualified for the position.

Since plaintiff satisfies his *prima facie* case, the burden then shifts to the defendant to proffer legitimate business reasons supporting its decisions. Defendant proffers two primary reasons why plaintiff was denied the position of chair and sanctioned in other ways.

First, defendant maintains that plaintiff performed poorly as chairperson and needed to be replaced by someone who would revitalize the department. It is undisputed that plaintiff's 1995–96 annual report did not include all of the information he was required to divulge. As stated above, plaintiff failed to provide evaluations of faculty members from his department. Plaintiff knew that he was required to provide those evaluations. He had already challenged the Dean's authority to request that information and had been soundly rebuffed. Yet, plaintiff persisted in not providing this information to the Dean.

■ Plaintiff does not dispute that he did not do everything that the Provost sought from a chairperson. Instead, at least with regards to the 1995–96 annual report and its inadequacies, he argues that he "focused upon the issues which [he] considered to be important." (Def.'s Opp. Br. at 20). That misses the point. Plaintiff's focusing on issues he deemed important does not excuse his failure to abide by his assigned duties.

Plaintiff also argues that the timing of when plaintiff complained about the alleged discrimination in his 1995–96 annual report and when he was disapproved of demonstrates that defendant's legitimate reason is a pretext for discrimination. Plaintiff however submits no evidence that he had a habit of submitting inadequate annual reports that were overlooked by the Dean and/or Provost. Further, his

complaint about discrimination was not the first time SHU was put on notice regarding those alleged incidents. As plaintiff's report makes clear, he was simply reiterating what was well known by SHU.

Additionally, this was not the first time plaintiff was disapproved as chairperson. In the Spring of 1993, Provost Scholz disapproved of plaintiff because he was concerned about plaintiff's performance as chairperson and faculty members, such as plaintiff, monopolizing chair positions to the detriment of their department. Although the Provost relented and allowed plaintiff to become chairperson, it is clear the Provost warned plaintiff that he would be watching plaintiff's performance. Notably, plaintiff had not been surprised by Scholz's disapproval of his election in 1993. Plaintiff admitted that he anticipated meeting resistance from Scholz in 1993 because plaintiff "might have been one of the impediments to [Scholz's] goals" as Provost. (Def.'s Ex. 5 at 302:18–25, 304:4–9). Plaintiff however offers no explanation why he should have anticipated a different result three years later when he continued to clash with Scholz's and the Dean's goals.

Defendant also persuasively argues that plaintiff lacked the leadership ability needed to right an ailing department. The Dean found that under plaintiff's watch, enrollment had plummeted dramatically in the Economics Department in comparison to the University overall. Plaintiff does not dispute that during his time as chairperson enrollment was down. Plaintiff however blames external factors, such as the cost of tuition at the school, for the precipitous drop. But, in doing so, plaintiff fails to account for the huge gulf that existed between the enrollment drop in the Economics Department and the University in general, which should be similar if external factors were indeed the cause in the decline. From 1991 to 1995, the enrollment in the University dropped approximately three percent, whereas the enrollment in the Economics Department dropped a whopping 35 percent. In sum, plaintiff has not been able to muster sufficient evidence to discredit defendant's first legitimate reason. But there is more.

SHU's second legitimate reason for sanctioning plaintiff with regards to the chair incident was that plaintiff defied Provost Scholz's authority by accepting the chair position after he had already been disapproved for that position. Defendant argues that there is nothing to suggest that the Provost's reason for disapproval was anything other than plaintiff's defiance. Indeed, defendant refers to a previous incident where the Provost sanctioned another professor for the very same reason. That professor, William Jones, was American-born and Catholic.

Plaintiff offers two rather paltry rebuttal arguments. Plaintiff first claims that it was not his fault that he became chairperson in September 1996, but his peers' fault for nominating him. However, that argument simply ignores the reality of what took place. Although his peers did nominate him a second time, plaintiff voluntarily accepted the chair position a second time. Second, plaintiff argues that Professor William Jones is not a valid comparator. Plaintiff argues that unlike himself, Jones was not qualified for the position and had committed a more serious violation than he had. But that argument simply ignores the fact that Provost Scholz also doled out a more severe sanction to Jones than he did to plaintiff. Jones was asked to resign; plaintiff was not. Plaintiff's attempt to distinguish the Jone's situation fails. It is clear that Scholz did not allow insubordination. When people, such as plaintiff, defied his authority, they were punished, regardless of their national origin or religion.

Accordingly, summary judgment is granted on plaintiff's discrimination claims in favor of SHU.

### C. Plaintiff's National Origin Retaliation Claims

Section 704 of Title VII provides that: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e–3(a).

The burden of proof in Title VII and NJLAD retaliation cases is governed by the framework set forth in *McDonnell Douglas. Waddell v. Small Tube Prod.*, 799 F.2d 69, 73 (3d Cir.1986); *Abramson v. William Paterson College*, 260 F.3d 265, 286 (3d Cir.2001). "Plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case" of retaliation. *Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir.1989). In order to adduce a *prima facie* case in a Title VII retaliation case, a plaintiff must show that: (1) he engaged in protected conduct; (2) the employer took an adverse action against him; and (3) a causal link exists between his protected conduct and the adverse action. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir.1994) (quoting *Weiss v. Parker Hannifan Corp.*, 747 F.Supp. 1118, 1128 (D.N.J.1990)).

There is no dispute that plaintiff meets the first two elements of his *prima facie* case. Thus, the analysis focuses on the third element—whether a causal link exists. A plaintiff may establish a causal link by demonstrating a temporal proximity between the employee's protected conduct and the employer's adverse action. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir.1997) (citing *Zanders v. National R.R. Passenger Corp.*, 898

F.2d 1127, 1135 (6th Cir.1990)). However, that is not the only means of demonstrating causation. "[C]ircumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference." *Id.* (citing *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir.1993)). Further, an employer's inconsistent reasons for the adverse action may provide evidence of a causal link. *Waddell v. Small Tube Prod.*, 799 F.2d 69, 73 (3d Cir.1986). Ultimately, the Court must conduct a case-by-case, fact-sensitive analysis to determine whether the "proffered evidence, looked at as a whole, may suffice to raise the inference" of causation. *Kachmar*, 109 F.3d at 177.

Plaintiff must establish causation for both the chair and smoking incidents. With respect to the chair incident, plaintiff alleges that he was never formally disapproved as chair until shortly after he complained about discrimination in his 1995–96 annual report. According to plaintiff, the timing of his removal indicates retaliatory motive and is sufficient to establish a causal link.

Plaintiff's causal link for the chair incident is weak at best. As stated above, this was not the first time plaintiff was disapproved as chairperson. In 1993, Provost Sholz disapproved of him because he did not feel that plaintiff was the right person for the job. He considered plaintiff to be a poor leader who had failed to fulfill his obligations as chairperson. In 1996, Provost Scholz disapproved of plaintiff for those very same reasons. In addition, this was not the first time SHU was made aware of the discrimination claims of the other faculty members. As set forth in the 1995–96 annual report, plaintiff was describing discrimination grievances and/or complaints that had already been submitted to the University. Accordingly,

plaintiff has failed to demonstrate a causal link for the chair incident and, thus, does not adduce a *prima facie* case of retaliation.

But even assuming *arguendo* that plaintiff could establish a causal link, the Court would still dismiss plaintiff's retaliation claim for the same legitimate business reasons articulated above that defendant proffered in response to plaintiff's discrimination claim. Namely, plaintiff did not perform all of the duties required of a chairperson and was insubordinate for accepting a second nomination when he knew that Provost Scholz disapproved of him being chairperson. Accordingly, the Court grants summary judgment for defendant on plaintiff's retaliation claims arising from the chair incident.

■ With regards to the smoking incident, plaintiff argues that temporal proximity between the date the EEOC issued its determination, August 6, 1999, and the date defendant punished him for smoking, September 3, 1999, establishes the necessary causal link to satisfy his *prima facie* case. But this is a case where mere closeness in time does not establish a causal link. Significantly, plaintiff has produced no evidence demonstrating that Dean Martin, Associate Dean Boroff, or Professor Coll, the three people involved in sanctioning plaintiff for his alleged smoking, were even aware of the EEOC determination when the smoking incident took place. Thus, there is no evidence showing that Dean Martin or the others were in any way motivated to concoct a sham smoking incident in order to retaliate against plaintiff. But even if the Court was to overlook that glaring hole in plaintiff's case, and assume that plaintiff satisfies his *prima facie* case for purposes of this motion, plaintiff's claim still fails.

The last two steps of the retaliation analysis mirror the last two steps in a discrimination analysis under *McDonnell Douglas*. The burden shifts to the defendant to rebut the proof of retaliation by articulating some legitimate, nondiscriminatory reason for the adverse employment action. *Jalil*, 873 F.2d at 706. If the defendant satisfies its "relatively light burden," the burden of production returns to the plaintiff who must ultimately show by a preponderance of the evidence that defendant's proffered reason or reasons were not its true reasons, but rather a pretext for retaliation. *Fuentes*, 32 F.3d at 763. Plaintiff must do more than simply show that defendant's adverse employment decision was "wrong or mistaken." *Id.* at 765.

SHU offers an extremely plausible reason for sanctioning Plaintiff—he repeatedly violated the No Smoking Policy and the Dean finally punished him for his actions. It is undisputed that the Dean received numerous complaints about Plaintiff smoking in the building before August 1999. It is also undisputed that the Dean spoke to him about those complaints and the school's policy several times since the Fall of 1998. One of those times, when she approached him as he was leaving his office, his pipe was in his shirt pocket emitting smoke. When the events of September 1, 1999 unfolded, and the Dean received another complaint about the Plaintiff smoking in his office, it was simply one more complaint in a long series of complaints about plaintiff's smoking. After performing an investigation, the Dean concluded that Plaintiff was likely smoking in violation of the policy. Consequently, she sanctioned him.

In response, plaintiff argues that the Dean's investigation was a sham. Plaintiff points to an exculpatory memo forwarded to Dean Martin the day she sanctioned plaintiff. The memo was written by Bill Eilert, a person whose office was on the same floor as plaintiff's and who overheard

the verbal confrontation on September 1. In the memo, Eilert states that after plaintiff and Coll stopped arguing, he went out into the hallway near plaintiff's office and did not see or smell smoke.

■ But, even assuming that the Dean received and read Bill Eilert's memo before punishing plaintiff, plaintiff falls short of demonstrating that defendant's legitimate reason is a mere pretext. Defendant's actions are supported by ample evidence, including the report by Professor Rosenthal, which directly contradicted Eilert's memo. At most, Eilert's memo only suggests that the Dean may have been mistaken, but being mistaken is not enough to discredit defendant's reason for its actions. *Fuentes*, 32 F.3d at 765 (stating that the plaintiff must do more than show the defendant's action was wrong in order to rebut an employer's proffered reason). In short, there is no evidence that the Dean sanctioned plaintiff for any reason other than what she believed to be the umpteenth time plaintiff had violated the No Smoking Policy.

Thus, plaintiff cannot satisfy his burden under Title VII and NJLAD, and summary judgment is granted on the retaliation claims arising from the smoking incident in favor of SHU.

### D. *Plaintiff's Religious Discrimination/Retaliation Claims*

Plaintiff's discrimination and retaliation claims based on his Orthodox religion are baseless. He refers to three general statements made by SHU and others that allegedly establish his claim. First, a September 1988 statement by SHU's President that the school is "committed to its Catholicity and to insuring that its identity will be enhanced as we continue on our pilgrimage." (Def.'s Ex. 2). Second, a

November 14, 1996 New York Times article reporting that Catholic Bishops in the United States were calling on Catholic universities to "acknowledge publicly their Catholic identity and to make 'a serious effort' to appoint faculty members and administrators who are committed to the Catholic tradition, or if not Catholic, who are aware and respectful of that tradition." (Def.'s Ex. 3). And third, a November 1996 Administrative Announcement by SHU's President clarifying the school's non-discrimination policy. Besides saying that SHU is committed to prohibiting discrimination based on race, color, religion, national origin and sex, it also states that the "policy is [to be] carried out in accordance with the teachings of the Catholic Church and the prescriptions of the law." (Def.'s Ex. 4).

■ Based on that so-called evidence, plaintiff argues that SHU discriminated and retaliated against him as described above because of his Orthodox religion. Plaintiff however grossly overreaches here. Plaintiff chose to work at a Catholic university. Not surprisingly, that Catholic university happens to support Catholicism. Further, not surprisingly, Catholic Bishops support Catholicism and make general statements about Catholic universities supporting Catholicism. However, those general statements are far too nebulous to support plaintiff's claims of religious discrimination and retaliation. Plaintiff has shown no nexus between those statements and the sanctions imposed against him. Indeed, plaintiff admits, as he must, that he does not know if the Bishops' proclamation had any affect at all on SHU's policies [4]—because there is no such evidence in the record. Finally, plaintiff's myopic understanding of the nondiscrimination policy—that it must be carried out accord-

4. (Def.'s Opp. Br. at 3).

ing to the teachings of the Catholic Church—is unavailing; it not only fails to demonstrate that the policy was carried out in a way that violates the law, but ignores the remainder of the policy which expressly states that SHU is committed to and supports anti-discrimination laws, including laws that prohibit discrimination based on religion.

In short, plaintiff's religious discrimination and retaliation claims are completely meritless. Plaintiff submits no evidence that his religion was related in any way to the imposed sanctions. Thus, summary judgment is granted in favor of SHU, and those claims are dismissed.

## III. CONCLUSION

In summary, plaintiff's claims of discrimination and retaliation cannot survive summary judgment. Plaintiff obviously had a contentious relationship with his supervisors at SHU, and his attempt to recast their disciplinary measures as discriminatory and retaliatory steps taken to punish him because of his national origin and religion is simply not born out by the facts. Accordingly, defendant's motion for summary judgment is granted, and plaintiff's amended complaint is dismissed in its entirety.

## ORDER

This matter comes before the Court on defendant Seton Hall University's motion for summary judgment. For the reasons set forth in the accompanying Opinion, and for good cause shown,

**IT IS** on this 26th day of October 2004, hereby

**ORDERED** that defendant's motion for summary judgment is **GRANTED**, and

plaintiff's amended complaint is **DISMISSED** in its entirety.