155 N.J. Super. 232 (1977)
382 A.2d 677
WILLIE JONES, COMPLAINANT-RESPONDENT,
v.
COLLEGE OF MEDICINE AND DENTISTRY OF NEW JERSEY, RUTGERS MEDICAL SCHOOL AND DAVID MARTZ, RESPONDENTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 9, 1977.
Decided December 29, 1977.
*233 Before Judges MATTHEWS, CRANE and ANTELL.
Mr. Stephen P. Deitsch, Deputy Attorney General, argued the cause for appellants (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Ms. Erminie L. Conley, Deputy Attorney General, of counsel).
Mr. Thomas A. Battaglia, designated counsel, argued the cause for respondent.
PER CURIAM.
Presented for review is a determination of employment discrimination made by the Director of the Division of Civil Rights under the Law Against Discrimination, N.J.S.A. 10:5-1 et seq. The Director decided that *234 appellants had denied respondent, who is black, appointment to the position of security officer in the College of Medicine and Dentistry "on account of his race." He ordered, among other things, that respondent be immediately promoted to the position with full seniority and money damages based on pay differentials, pain and humiliation.
Respondent was first hired by appellant as a custodian on October 25, 1973. He later learned of an opening on the security staff and in December 1973 submitted his application therefor to David Martz, a personnel assistant. Before the application could be further processed it was necessary for respondent to obtain the approval of his supervisor in the custodian's department. Approval was given and Martz then referred respondent to Gordon Currie, the security staff supervisor who recommended all hiring for that department. Currie interviewed respondent on December 18, 1977. The opening had already been filled by Brian Clark, a white, who applied December 4, but other openings were expected.
Although Currie was favorably impressed by respondent, his application was placed on "hold" because, as respondent understood, Currie also intended to interview others. These turned out to include Edmund Munden, who applied on January 2, 1974, and Monica Sheehan, whose application was received January 8, 1974. Munden, who is white, was hired to begin work on January 16, 1974 and Sheehan, also white, was hired to begin March 11, 1974. David Gutierrez, an Hispanic male, was interviewed on January 21, 1974 and hired to fill an opening in June 1974. While respondent's application was pending appellant was publicly advertising the job vacancies as they occurred and sending announcements to community agencies that were in a position to encourage applications by "protected class" members. The latter group includes minorities and others who have historically been underrepresented in particular employment situations. Munden, as a male over 40, and Sheehan, as a female, are both members of the protected class under standards promulgated *235 by the United States Department of Health, Education and Welfare.
It was respondent's understanding and, although there was disagreement among the witnesses on the point, the Director found that applications from within the ranks of college employees were usually favored over those from without. Munden, Sheehan and Gutierrez were outsiders.
Between the time of his interview with Currie on December 18 and the time he resigned from his job on May 3, 1974, respondent asked Martz a number of times for the status of his application. Martz was noncommittal, made promises to speak with Currie and "get back" to respondent which were never kept, and was neglectful of respondent's application. The Director could properly have concluded, as he did, that Martz' conduct was evasive and dilatory, notwithstanding the explanations which the latter offered that the work of his office was impaired around that time by illness and resignations.
Currie, in explaining why he favored Munden and Sheehan over respondent, stated that in Munden's case he was impressed by his mechanical experience which, he felt, contributed to his potential for handling the job and, in Sheehan's case, by her previous experience in dealing with emotionally disturbed people. The Director found that respondent would have been able to show comparable experience if this information had been solicited. He found great significance in the fact that Currie did not reinterview respondent to investigate his background further or examine his original application for employment which was on file with the personnel department. The practice was to take written applications for vacant positions from candidates outside the college, but not from those who were already employed. Thus, the only information about respondent Currie ever received was what emerged during the personal interview.
Respondent impressed Currie favorably and he was described as "a highly motivated individual with a good military background" who "would be a good candidate for *236 the force." However, by April 1974 Currie learned of an absentee problem that had developed in respondent's work as a custodian, and by memorandum dated April 15, 1974 rejected his application. Thereupon respondent severed his employment with the college. At his exit interview with Martz he was told that his application had been turned down with regret, but that if he stayed the college would reconsider his application three or four months thereafter.
Respondent filed his complaint with the Civil Rights Division on April 8, 1974.
The aims of the statute under which this proceeding is brought are found in the following language of N.J.S.A. 10:5-4:
All persons shall have the opportunity to obtain employment * * * without discrimination because of race, creed, color, national origin, ancestry, age, marital status or sex, subject only to conditions and limitations applicable alike to all persons.
In furtherance thereof, N.J.S.A. 10:5-12(a) provides:
It shall be an unlawful employment practice * * * a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status or sex of any individual, * * * to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment ...
Discrimination involves the making of choices. The statute does not proscribe all discrimination, but only that which is bottomed upon specifically enumerated partialities and prejudices. Thus, we have held that in discrimination cases an intent to discriminate must be proved. Parker v. Dornbierer, 140 N.J. Super. 185, 189 (App. Div. 1976). Obviously, this means an intent to discriminate for the prohibited purpose charged. In recognizing this requirement we have not overlooked Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). That decision held only that a discriminatory intent need not *237 be shown where the effect of hiring practices and procedures was to "`freeze' the status quo of prior discriminatory employment practices" by barring blacks from jobs which had been formerly filled only by white employees. The case was a class action addressed to hiring practices which had a discriminatory effect. It involved a different issue than whether discrimination based on racial prejudice had actually been practiced upon a particular individual.
Nor have we disregarded McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), where the Supreme Court enunciated the following standards by which a complainant may establish a prima facie case of racial discrimination:
* * (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. [at 802, 93 S.Ct. at 1824.]
The weakness of this formulaic approach can be gathered from the court's caveat that in light of varying fact situations this standard "is not necessarily applicable in every respect to differing factual situations." Id. at 802, n. 13, 93 S.Ct. at 1824.
We recognize the convenience of having a test which authorizes specified conclusions once certain findings have been made, thereby calling upon an employer to "explain" its action. Here, racial bias as a factor in discrimination is made to be inferable from the fact of complainant's racial status alone. But by obviating the need for some independent proof of vicious intent an employer's protection from claims of discrimination is significantly diminished. A wide range of circumstantially based cases is opened up wherein it becomes unreasonably difficult for an employer to demonstrate why prima facie proofs having only the loosest logical connection to the ultimate issue should not command a finding of *238 illegal discrimination. Here, the inference of racial bias as a reason for discrimination is suggested by nothing in the record beyond the fact that the job applicant happens to belong to a particular racial group. Therefore, care must be taken that the fact finder did not draw conclusions which were plainly unwarranted under all the circumstances and remained mindful that discrimination cases are no different from others in resting the burden of proof by a preponderance of the evidence upon the complaining party. Jackson v. Concord Company, 54 N.J. 113, 119 (1969).
In our view, the Director failed to consider and give appropriate weight to surrounding evidence which pointed decisively away from racial discrimination as an explanation for respondent's rejection.
Located in Piscataway Township, appellant drew about 90% of its nonfaculty employees from the Somerset-Middlesex County area. According to 1970 census figures, 4.2% of this population is black, and blacks represent 5% of the labor force in that region, 2.8% being males and 2.2% females. During the period relevant to the complaint appellant's nonfaculty employees numbered 710, of whom 92 were black. Of the 15 members of the security staff three, or 20%, were black, one was a woman and one a male of Hispanic descent. Indeed, respondent learned of the first staff opening through a friend, Edison Paine, himself a black, who was preparing to leave the position. It also appears without contradiction that at the time respondent's application was pending, appellant was functioning under hiring guidelines established by the United States Department of Health, Education and Welfare which required affirmative action to recruit federally-defined protected class members. As we said earlier, Edmund Munden and Monica Sheehan enjoyed the protection of this classification. We note also that as early as the Fall of 1973 Currie had emphasized to the personnel manager of the college that he wanted her to "screen and recruit qualified minorities for the security staff."
*239 While discounting almost entirely the significance of the foregoing factors in reaching his conclusion that racial prejudice had a causative role in rejecting respondent's application, the Director placed great emphasis upon the fact that (1) having learned of Munden's mechanical experience and Sheehan's previous work with the emotionally disturbed, Currie failed to give respondent an opportunity to match those special qualifications and thereby "denied him the full opportunity to be considered for the Security Officer positions," and (2) respondent's follow-up inquiries were evasively answered by Martz.
The emphasis which these received could only have resulted from a clearly mistaken perception of their context. The skills disclosed by Munden and Sheehan were by no means qualifications essential to the position about which respondent had been kept uninformed. They were simply personal attributes which Currie thought, for valid reasons, gave added substance to their candidacies and enhanced their prospective usefulness as security officers. We think it unreasonable to require as part of a nondiscriminatory hiring program that previously interviewed applicants be reexamined to determine whether they can match incidental skills and attributes disclosed by later interviewees. Currie's omission in this regard cannot be equated, as the Director did, with "withholding material information" as a discriminatory practice of the kind condemned in United States v. Central Motor Lines, Inc., 338 F. Supp. 532 (W.D.N.C. 1971); Lea v. Cone Mills, 301 F. Supp. 97 (M.D.N.C. 1970), and United States v. Georgia Power Co., 3 FEP 76 (N.D. Ga. 1971), aff'd 474 F.2d 906 (5 Cir.1973). In those cases information vital to pursuing the application was deliberately withheld from blacks as a regular hiring practice to foreclose them from industrial job opportunities historically open only to whites.
That evasive and dilatory conduct may properly be weighed as signifying a discriminatory purpose is clear. But this interpretation rests on the assumption that it was motivated by *240 racial bias and was employed to discourage the applicant. Wilson v. Sixty-Six Melmore Gardens, 106 N.J. Super. 182, 185 (App. Div. 1969). Such an assumption is negated here by affirmative evidence to the contrary. Respondent was told that his department supervisor had recommended him "very highly" and, as he testified, Martz told him that as an employee of the college he would be given favored consideration. Currie was favorably impressed by him. He regarded him as qualified for the job and respondent was told by Martz that if he remained in his job his application would be reconsidered. And, as we have said, the college's hiring patterns are completely inconsistent with a finding of racial prejudice.
It may well be, as the Director found, that respondent was well qualified for the job. It may also be that his application was not given the attention it deserved and that its rejection resulted from poor personnel work rather than a careful weighing of its merits. Nevertheless, measured against the pertinent considerations which we have reviewed, making due allowance for his expertise and evaluations of credibility, we conclude that the Director's determination of employment discrimination on racial grounds was lacking in substantial credible evidence, considering the proofs as a whole, and was plainly unwarranted. Parkview Village Ass'n v. Collingswood, 62 N.J. 21, 34 (1972); Close v. Kordulak Bros., 44 N.J. 589, 599 (1965).
Reversed.