747 A.2d 802 (2000)
329 N.J. Super. 295
Mark JASON, Plaintiff-Appellant,
v.
SHOWBOAT HOTEL & CASINO, Roberta Garvey and Lorraine Furey, jointly, severally and in the alternative, Defendants-Respondents,
Superior Court of New Jersey, Appellate Division.
Argued March 1, 2000.
Decided March 28, 2000.
*803 Richard T. Fauntleroy, Northfield, for plaintiff-appellant.
Joseph G. Antinori, Atlantic City, for defendants-respondents (Fox, Rothschild, O'Brien and Frankel, attorneys; Mr. Antinori, of counsel and on the brief).
Before Judges BAIME and WECKER.
*804 The opinion of the court was delivered by WECKER, J.A.D.
Plaintiff, Mark Jason, was terminated from his employment with defendant Showboat Hotel and Casino on December 30, 1995. His complaint against Showboat and the individual defendants[1] ("Showboat" or "defendant" collectively) alleges race discrimination in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42; a Pierce[2] claim for wrongful termination in violation of public policy by virtue of disciplinary procedures imposed by defendant in its employee handbook, claimed to be a contract of adhesion; and a Woolley[3] claim for violation of the employee handbook.[4] Plaintiff appeals from summary judgment dismissing his complaint in its entirety.
We have carefully reviewed the record, the briefs, and the arguments of counsel, and we are satisfied that summary judgment was justified and was not imposed in error. We therefore affirm. Plaintiff's contentions with respect to the employee handbook as a violation of public policy, as well as a contract that was itself violated, are without sufficient merit to warrant extended discussion in this opinion. See R. 2:11-3(e)(1)(E). Suffice it to say that an employer is entitled to promulgate its own disciplinary rules and procedures, and the record clearly establishes that plaintiff was afforded all of the procedural rights to which he was entitled under Showboat's employee handbook.
We are equally satisfied that Jason failed to offer sufficient proofs to withstand summary judgment dismissing his LAD claim. However, we deem it appropriate to discuss that claim in somewhat more depth.
Plaintiff, who is African-American, began working at the Showboat Casino in Atlantic City in May 1987 as a part-time dealer. He became a full-time dealer in June 1989. By April 1990, when he became a full-time "boxperson," he had been promoted twice. By 1993 he was a "floorperson," apparently the highest non-managerial position on the floor of the casino, with responsibilities for overseeing the performance of lower level employees on the floor, including other dealers. He was a floorperson when he was terminated on December 30, 1995.
Defendant cited four incidents between October and December 24, 1995 as grounds for Jason's termination on December 30, which was precipitated by the December 24 confrontation with a casino patron. The first cited incident involved a charge that Jason took an unauthorized break while working an overnight shift, a charge which plaintiff disputed at the time. The second, on December 16, for which plaintiff was not cited until December 24, involved plaintiff's allegedly unauthorized change in his break schedule and his demeanor in response to a supervisor's questions about his break schedule. The third, for which plaintiff also was not cited until December 24, involved an alleged failure on December 18, 1995 to report certain irregularities in the conduct of a dealer at a table under his supervision.
The December 24 incident that precipitated plaintiff's termination involved Yin Ho, an Asian patron whom plaintiff refused to pay in the black chips ($100) that *805 Ho requested. Jason insisted on paying Ho in higher denomination purple or orange chips ($500 and $1,000 respectively). The player, who complained about plaintiff's treatment and was threatening to leave with his friends, had to be mollified by supervisors. Plaintiff was removed from the game and brought to the shift manager's office, where Jason and defendants Furey and Garvey, who held supervisory positions over him, had a heated discussion about how plaintiff had handled this particular patron.
According to plaintiff, Ho was engaged in several distracting behaviors, such as handing plaintiff empty glasses and full ashtrays to dispose of, and throwing checks to an associate across the table, all while betting heavily. Plaintiff claimed that when plaintiff instructed the dealer to pay the Ho in purple chips, Ho shouted profanities and broke the "shoe" holding the baccarat cards. Plaintiff explained his concern about Ho's passing chips to other players and general unwillingness to cooperate. Furey reminded Jason of Showboat's policy to honor a patron's request for payment in chips of a particular color. Jason was argumentative, according to Furey and Garvey, and when Garvey declared that "this incident could destroy our oriental market," plaintiff became more argumentative and jumped up to confront her. Furey told plaintiff that others also felt intimidated by him. She then presented the written warnings for the December 16 and 18 incidents mentioned above, which she and Garvey signed in front of Jason. Plaintiff defended his conduct in those incidents and refused to sign the warnings. Furey told him it was "a universal opinion of his Pit Managers that he lacks in interpersonal skills." She and Garvey told him the Ho incident would be investigated and sent him back to work at another pit.
On December 30, 1995, plaintiff received a written notice of termination for insubordination and "gross rude and discourteous behavior to a patron." Garvey and Furey signed the notice of termination. Plaintiff did not sign the notice, but in the section for employee statement he noted his "complete disagreement."
It is undisputed that Showboat's employee handbook provides that after a ninety-day probationary period, employees such as Jason can be terminated only for cause. The handbook spells out standards of conduct, including a provision that "guest" complaints should be handled in a manner to encourage the guest to return to the casino in the future. Among a non-exclusive list of "prohibited conduct that could lead to discipline up to and including termination" are: "[i]ndecent or abusive language while on duty," "[r]ude or discourteous behavior to a patron or fellow employee," and "[l]eaving assigned work area without permission." The handbook warns that "business demands may necessitate changes in your shift ... [but][u]nauthorized changes [in work schedule] will result in disciplinary action." Defendant has a written policy, separate from the handbook, that insofar as possible, patrons at the gaming tables should be paid in chips of whichever denomination the patron played. The handbook itself also provides a point system for addressing absence and lateness, and the cumulation of eight points within any twelve month period is a ground for termination.
Plaintiff's disciplinary record includes warnings for attendance problems in 1988 and nine notices of violations of floor conduct between August 1993 and January 1994. Between June and November 1994, plaintiff received attendance warning notices that he had accumulated "points" which had reached a level that allowed defendant to terminate him under the employee handbook's published rules. In July 1994 he also received a written warning for making an obscene gesture to a co-worker in the presence of casino patrons, which plaintiff admitted.
Showboat's employee handbook provides a procedure for an employee to challenge a termination decision before an internal *806 Board of Review and thereafter before an internal Board of Appeals. Plaintiff was afforded the opportunity, in accordance with the handbook, for an internal Board of Review hearing. Although the Board's written decision rejected a charge of insubordination, it stated that plaintiff had "missed opportunities to accommodate the player which led to the incident escalating." The three members of the Board of Review voted unanimously to uphold the termination. Thereafter, the Board of Appeal also upheld plaintiff's termination, concluding that plaintiff had been discourteous to Ho, who had made a reasonable request for a form of payment that there "was no logical reason to deny," and that plaintiff's "actions repelled instead of encouraged business."
Jason contends that summary judgment was erroneously granted because despite defendant's proffered legitimate, non-discriminatory reasons for his termination, he was entitled to have a jury consider evidence that defendant treated white employees more leniently, and to draw an inference from such evidence that plaintiff's race was a substantial factor in his termination.
Under the LAD, it is unlawful "[f]or an employer, because of the race ... of any individual, ... to discharge" such a person "unless justified by lawful considerations...." N.J.S.A. 10:5-12(a). However, it is not the purpose of the LAD "to prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards...." N.J.S.A. 10:5-2.1.
Plaintiff's theory is viable. Treating white employees more leniently than black employees for similar infractions can be a violation of the New Jersey Law Against Discrimination. But plaintiff's proofs are insufficient to withstand summary judgment under the Brill[5] standard.
We begin our analysis of a LAD claim with the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), recognizing that that framework is to be adapted to the circumstances of the claim. See, e.g., Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97-98, 570 A.2d 903 (1990); Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 81-83, 389 A.2d 465 (1978).
Under McDonnell Douglas, the employee first must demonstrate a prima facie case of discrimination; the burden of producing evidence then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for" the action. 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677-78. The employee then gets "a fair opportunity to show that [the employer]'s stated reason was in fact pretext," Id. at 804, 93 S.Ct. at 1825, 36 L.Ed.2d at 679, or that the action in question occurred "under circumstances which give rise to an inference of unlawful discrimination." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 215 (1981). See, e.g., Romano v. Brown & Williamson Tobacco, 284 N.J.Super. 543, 665 A.2d 1139 (App.Div. 1995).
[O]nce a defendant has met its burden of production of a legitimate reason for the discharge, the plaintiff is afforded the opportunity to show that a discriminatory intent motivated the defendant's actions, and not the legitimate reason offered by defendant. Jamison, supra, 242 N.J.Super. at 445, 577 A.2d 177. Plaintiff may do this indirectly, by proving that the proffered reason is a pretext for the retaliation, or directly, by demonstrating that a discriminatory reason more likely than not motivated defendant's action. Id. at 445-47, 577 A.2d 177.
*807 [Romano, 284 N.J.Super. at 551, 665 A.2d 1139.]
See also Kelly v. Bally's Grand, Inc., 285 N.J.Super. 422, 431, 667 A.2d 355 (App. Div.1995); Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir.1994). The motion judge correctly enunciated the McDonnell/Douglas framework as outlined in Kelly.
Evidence of pretext sufficient to permit the employee to reach a jury may be indirect, Burdine, supra, 450 U.S. at 255-56, 101 S.Ct. at 1094-95, 67 L.Ed.2d at 216-17, such as a demonstration "that similarly situated employees were not treated equally." Id. at 258, 101 S.Ct. at 1096, 67 L.Ed.2d at 218. The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 253-54, 101 S.Ct. at 1093-94, 67 L.Ed.2d at 215-16.
A claim of racially disparate treatment requires the employee to prove a discriminatory motive, although in some cases the motive may be inferred from the disparate treatment itself. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396, 415 n. 15 (1977); Peper v. Princeton Univ., 77 N.J. 55, 389 A.2d 465 (1978). In Jackson v. Georgia-Pacific Corp., 296 N.J.Super. 1, 685 A.2d 1329 (App.Div.1996), certif. denied, 149 N.J. 141, 693 A.2d 110 (1997), we said that to present a prima facie case based upon discriminatory discipline, the employee must show:
(1) That plaintiff was a member of a protected group;
(2) That there was a company policy or practice concerning the activity for which he or she was discharged;
(3) That the non-minority employees either were given the benefit of a lenient company practice or were not held to compliance with a strict company policy; and
(4) That the minority employee was disciplined either without application of a lenient policy, or in conformity with the strict one.
[296 N.J.Super. at 21, 685 A.2d 1329 (citing E.E.O.C. v. Chas. Schaefer Sons, Inc., 703 F.Supp. 1138, 1147 (D.N.J.1988)).]
"Especially relevant to such a showing would be evidence that white employees involved in acts ... of comparable seriousness... were nevertheless retained...." McDonnell Douglas, supra, 411 U.S. at 804, 93 S.Ct. at 1825, 36 L.Ed.2d at 679.
A disparate treatment claim with regard to discipline requires comparison between the defendant's conduct toward plaintiff and other members of the protected class on one hand, and similarly situated employees not within the protected class on the other.
Addressing a claim of sex discrimination in promotion as a violation of the equal protection clause of the state constitution, our Supreme Court held in Peper that promotion of a "similarly situated" male over an equally qualified woman could evidence invidious discrimination. 77 N.J. at 84, 389 A.2d 465. In the promotion context, the Court explained: "By `similarly situated' we mean those persons possessing equivalent qualifications and working in the same job category as plaintiff." Id. at 84-85, 389 A.2d 465. The Court cautioned: "[W]e do not mean to suggest that [the listed] aspects of `similarly situated' status are exhaustive or of equal significance in different employment contexts. The trial judge will have to make a sensitive appraisal in each case to determine the most relevant criteria." Id. at 85, 389 A.2d 465. Thus there is no bright-line rule for determining who is a "similarly situated" employee.
Plaintiff cites fifteen other employees who were terminated between 1990 and 1995; ten were Caucasian, one was Asian, and five were African-American. Three of those employees were on probation when they were terminated, leaving twelve non-probationary employeeseight *808 Caucasians and four African-Americans who were terminated for inappropriate conduct toward a patron, a supervisor, or a co-employee. We see no permissible inference of race discrimination from that evidence.
As evidence of defendant's more lenient discipline of Caucasian employees, Jason also cites the cases of two employees,[6] Paul Catalano and Peggy Mott-Mossey, who were not terminated despite charges of rude conduct toward a patron or co-employee. Although both of those employees resigned, Showboat's records show both as "eligible for rehire." Paul Catalano was a floorperson who was cited for "inappropriate and disrespectful comments towards a fellow employee" (apparently racial comments) on June 23, 1993. Catalano was placed on six months probation and removed from a desirable assignment list. On July 5, 1996, he was given a written "last and final warning" as a result of a finding of sexual harassment, and he acknowledged that "any future violation... will result in my termination." As a result of letters Showboat received from casino patrons, Catalano also received two commendations for "outstanding service" on May 8, 1995 and on February 14, 1996. Catalano resigned on August 20, 1997. Plaintiff also cites the case of Peggy Mott-Mossey, who received a verbal notice recorded on December 11, 1995, in which she was "admonished for a rude and discourteous reaction to a player." Mott-Mossey's resignation is dated three days earlier, December 8.
We do not adopt the motion judge's premise that both the positions and the infractions necessarily must be identical to permit an inference of discriminatory intent from disparate treatment. However, we need not reach the question of comparability here. Even if we assume that the positions held by the employees Jason cites, as well as their infractions, were sufficiently similar to his position and his conduct to provide a relevant comparison, we discern no racial pattern whatsoever in the discipline imposed. The incidents cited therefore cannot prove plaintiff's LAD claim.
We have carefully examined the record in light of plaintiff's contention that similarly situated white employees whose misconduct was comparable to plaintiff's were not terminated. Catalano is the only one who may have been treated more leniently; but eight white employees were also terminated for similarly inappropriate conduct. We are satisfied that the individual cases cited by plaintiff do not, either singly or together, support plaintiff's claim. Nothing in the factual information presented suggests that plaintiff or the other named minority employees were treated less favorably than non-minority employees who engaged in similar conduct. An "inference of discrimination" does not arise "anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably." Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir.1998). See also Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th Cir.1993), cert. denied, 511 U.S. 1071, 114 S.Ct. 1648, 128 L.Ed.2d 367 (1994) (jury verdict finding no race discrimination in plaintiff's firing upheld).
Plaintiff offered no other evidence that defendant's legitimate, non-discriminatory reason for his termination, namely misconduct on the job, was pretextual. And plaintiff failed to offer any other evidence from which a reasonable factfinder could conclude that a discriminatory reason was more likely than not a substantial factor in defendant's decision to terminate him.
As the motion judge noted in his oral opinion on March 4, 1999, defendant had grounds to terminate plaintiff a year earlier, after he had accumulated sufficient attendance *809 "points" to justify termination under defendant's undisputed rules. While not determinative, defendant's earlier forbearance is consistent with the absence of credible evidence of defendant's discriminatory intent in Jason's 1995 termination.
Plaintiff's defense of the summary judgment motion, and his argument to us, consists largely of the contention that Furey and Garvey did not give enough credit to Jason's description of the Ho incident, and that their interpretation of that incident was unfair to him. But that is not the issue in a LAD claim. Just as under Title VII, "a firm's business judgment of highly subjective criteria, exercised in good faith, will not be second-guessed in the absence of some evidence of impermissible motives." Davis v. Rutgers Cas. Ins. Co., 964 F.Supp. 560, 573 (D.N.J. 1997). "[W]e must be mindful that judicial intervention in the private employment context has a limited purpose. Anti-discrimination laws do not permit courts to make personnel decisions for employers. They simply require that an employer's personnel decisions be based on criteria other than those proscribed by law." Peper, 77 N.J. at 87, 389 A.2d 465.
Under Brill, the motion judge appropriately considered whether the competent evidence, viewed most favorably to the party opposing judgment, was "sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." 142 N.J. at 540, 666 A.2d 146. We agree that it was not.
We affirm.
NOTES
[1] The complaint does not allege facts supporting a cause of action against Showboat employees Roberta Garvey and Lorraine Furey individually, and plaintiff's contentions with respect to those individual defendants relate solely to their roles as employees of defendant Showboat. We therefore refer in our opinion to "defendant" in the singular, except where Garvey or Furey are specifically named.
[2] Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72, 417 A.2d 505 (1980).
[3] Woolley v. Hoffmann-La Roche, 99 N.J. 284, 491 A.2d 1257, modified, 101 N.J. 10, 499 A.2d 515 (1985).
[4] Plaintiff voluntarily dismissed a count for retaliatory discharge in violation of the LAD.
[5] Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
[6] A third is unidentified and referred to by plaintiff only in hearsay.