**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1294-16T4

VICTORIA CRISITELLO,

    Plaintiff-Appellant,

v.

ST. THERESA SCHOOL,

    Defendant-Respondent.

_____

        Argued December 14, 2017 — Decided July 24, 2018

        Before Judges Simonelli, Rothstadt and
        Gooden Brown.

        On appeal from Superior Court of New Jersey,
        Law Division, Union County, Docket No. L-
        3642-14.

        Thomas A. McKinney argued the cause for
        appellant (Castronovo & McKinney, LLC,
        attorneys; Thomas A. McKinney, of counsel
        and on the briefs; Megan Frese Porio, on the
        briefs).

        Christopher H. Westrick argued the cause for
        respondent (Carella, Byrne, Cecchi, Olstein,
        Brody & Agnello, PC, attorneys; Christopher
        H. Westrick, of counsel and on the brief;
        John V. Kelly, III, on the brief).

PER CURIAM

Plaintiff Victoria Crisitello is an elementary school teacher who was previously employed by defendant St. Theresa School, a Roman Catholic parochial school. Defendant terminated plaintiff's employment after she disclosed that she was pregnant and defendant's school principal determined plaintiff was unmarried. According to the principal, defendant fired plaintiff for engaging in premarital sex, a violation of defendant's ethics code and policies. After her termination, plaintiff filed suit against defendant under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49.

Plaintiff now appeals from the Law Division's order barring certain discovery, denying reconsideration of the discovery order, granting defendant summary judgment and dismissing her complaint. On appeal, she contends that, contrary to the trial court's decision, her LAD claim was not barred by the First Amendment or the LAD's "religious exemption[,]" and she was entitled to discovery of "similarly situated employees."

We have reviewed the record in light of the applicable principles of law. For the reasons that follow, we reverse each of the orders under appeal.

The facts derived from the summary judgment record, viewed "in the light most favorable to [plaintiff,] the non-moving party[,]" Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016)

(citing R. 4:46-2(c)), are summarized as follows. Defendant is a Roman Catholic elementary school, owned and operated by the St. Theresa Roman Catholic Church (Church), which is part of the Archdiocese of Newark (Archdiocese). Defendant was established by the Church to operate as a Roman Catholic institution, committed to providing an education in a religious environment.

As part of defendant's effort to maintain a religious environment, it adopted the religious policies on professional and ministerial conduct espoused by the Archdiocese, including a code of ethics. That code states: "Church personnel shall exhibit the highest Christian ethical standard and personal integrity," and "shall conduct themselves in a manner that is consistent with the discipline, norms and the teachings of the Catholic Church." The policies further preclude immoral conduct by employees, which is defined as "[c]onduct that is contrary to the discipline and teachings of the Catholic Church[,] and/or which may result in scandal . . . or harm to the ministry of the Catholic Church." They apply to clergy members and the "lay faithful," which are defined as all "paid personnel whether employed in areas of ministry or other kinds of services . . . ." Defendant's faculty handbook also contains numerous provisions aligning with the Church's tenets, including a section labeled "Christian Witness[,]" which required teachers

to practice a "value-centered approach to living and learning in their private and professional lives."

None of the policies or provisions of the handbook expressly identified premarital sex as a prohibited conduct. According to the school's principal, Sister Theresa Lee, there was no specific statement in any document that "would inform someone that if they became pregnant while being unmarried that they would be violating [any] policy."[1]   There was also no

---

[1]   The only specifically identified prohibited behavior was contained in the Church's code of ethics, which included a chapter entitled "Prevention of Immoral Conduct: Guidelines for Ethical Behavior."   Under that chapter, in a section entitled "Standards for the Archdiocese as to Prevention of Immoral Conduct," specific prohibited conduct was defined as:

    a.  Immoral conduct.

    b.  Procurement or participation in the procurement of abortion, or committing homicide or euthanasia.

    c.  Possession or distribution of pornographic material.

    d.  Adultery, flagrant promiscuity or illicit co-habitation.

    e.  Abuse of alcohol, drugs, or gambling.

    f.  Theft, fraud, or any other form of misappropriation or misuse of Church funds or property.

    g.  Sexual exploitation or abuse.

(continued)

A-1294-16T4

statement in the documents that a violation of any provision would result in immediate termination from employment.

In September 2011, when defendant hired plaintiff as a lay teacher for toddlers, plaintiff signed an acknowledgement of receipt and understanding of defendant's polices and ethics code, and a similar acknowledgement for the faculty employment handbook. She executed similar documents a year later. Plaintiff was already familiar with the Church's teachings, including its prohibition against premarital sex.

In mid-January 2014, plaintiff and Lee met to discuss plaintiff taking on additional responsibilities at the school. During that conversation, plaintiff told Lee that she was pregnant and, if she were given additional work, she would like to be paid more than her current salary. Lee informed plaintiff that there would be no salary increase. She did not mention anything about plaintiff being pregnant or unmarried.

On January 29, 2014, after consulting with other clerical and school personnel, Lee decided to fire plaintiff for engaging in premarital sex. Before terminating plaintiff, defendant

---

(continued)
      h.  Physical assault and fighting.

      i.  Conduct which is illegal under the laws
          of our country, state or local
          government.

hired a replacement.  The new employee, a woman, was married and had children.

At a meeting attended by Lee, a priest, who did not otherwise participate, and plaintiff, Lee told plaintiff to either resign or she would be terminated because she was pregnant and unmarried.  Defendant's termination of plaintiff was not based on any reason related to her job performance.  Rather, according to Lee, she fired plaintiff when she determined that plaintiff violated the Church's ethical standards.  As Lee explained:

> Plaintiff was terminated on January 29, 2014 after I became aware that she was carrying a child in an unmarried state, which necessarily meant that she had engaged in sex outside of marriage.  Sex outside of marriage is not permitted in the Catholic Church.  Sex outside of marriage violates the tenets of the Catholic church.  Thus, [plaintiff] violated her obligations under the [p]olicies, including the [c]ode of [e]thics.  She has not exhibited the highest Christian ethical standards and personal integrity, which [were] required of her.  Furthermore, she has not conducted herself in a manner that is consistent with the discipline, norms and teachings of the Roman Catholic Church.

Lee asserted that the school "has nothing against pregnant teachers" as long as they were "married at the time of being with child . . . ."  Plaintiff understood that "not being

married and getting pregnant [violated] the rules of the Catholic church."

According to Lee, during her tenure as principal at the school from August 2013 to June 2014, plaintiff was the only employee that was fired based upon a violation of defendant's ethics code or policies. Violations that would warrant terminating an employee, according to Lee, included being divorced. However, Lee never made an inquiry of any employee as to whether they were pregnant, unmarried, engaged in premarital sex, divorced, or otherwise violated any of the Church's doctrines. According to Lee, she fired plaintiff only after plaintiff told her about the pregnancy and Lee later determined that plaintiff was not married.

On October 8, 2014, plaintiff filed her complaint in this action alleging "[d]efendant's articulated reason for terminating [her] employment [was] a mere pretext for discrimination on the basis of [p]laintiff's pregnancy" and "her marital status" of being "unmarried." The following January, defendant moved for summary judgment, which the court denied to allow discovery "limited to similarly situated employees."[2] In a

---

[2] In support of its first motion for summary judgment, defendant filed a certification from Deacon John J. McKenna who since 2001 has been the Archdiocese's Vice Chancellor and Executive

(continued)

certification filed in support of defendant's motion for summary judgment, defendant disclosed the number of faculty members who were married and not married.

Plaintiff sought from defendant production of information about defendant's other pregnant employees and divorced employees dating back to 2004, as well as disclosure of any discrimination or similar complaints made since 2001 or LAD claims since 2004. Defendant only produced information about pregnant teachers who worked at the school while Lee was principal. When defendant refused to produce the other requested information, plaintiff filed a motion to compel. In response, defendant moved for a protective order, arguing that the information was "confidential and protected by the First Amendment, and therefore not discoverable."

On April 22, 2016, the trial court granted in part both parties' motions. In its written decision, the court stated that it could not order discovery about divorced teachers

(continued)
Director of Human Resources. In his certification, he stated that he "was advised of a situation at [another school in the Archdiocese] where an unmarried male teacher [was fired when he] asked for temporary leave of absence because his 'girlfriend' was at the hospital giving birth." The certification and the accompanying exhibit was referred to by the trial court in its decision granting defendant's second motion for summary judgment even though it was not part of defendant's supporting documents for that motion and it was unrelated to defendant's actions.

because it would require a determination that "divorced teacher[s] and pregnant teacher[s] are similarly situated under the tenets of the Catholic Church[,]" which "would involve an intrusion into the religious dogma and polity[,]" of defendant that is prohibited by the First Amendment. It found that "[n]othing in the record shows that [p]laintiff was terminated based solely upon her marital status[, and] to conclude that a divorced employee and a pregnant employee are 'similarly situated,' the [c]ourt would need to determine that [the two] are viewed equally within the Catholic Church." It therefore limited discovery to information about only other pregnant employees or those who impregnated others during the preceding three years.

Plaintiff moved for reconsideration of the court's April 22 order, which the court denied on May 27, 2016, after considering the parties' oral arguments. In its oral decision, the court found that plaintiff's motion was proper because it raised the issue of the court having possibly overlooked the significance of controlling case law and arguably persuasive opinions from other jurisdictions. Nevertheless, after considering the case law argued by plaintiff, the court maintained that it would be impermissible for it "to engage in a series of inquiries that revolved around the interpretation of defendant's dogma and

polity[,]" if it were to decide whether divorced teachers were similarly situated to pregnant, unwed teachers such as plaintiff.

The discovery eventually provided to plaintiff indicated that while other teachers were pregnant and therefore similarly situated to her in that respect, none of the pregnant teachers conceived while unmarried and they all retained their employment. There was no discovery served that related to an unmarried pregnant teacher or any male teachers.

After discovery concluded, defendant renewed its motion for summary judgment, which the court granted on November 10, 2016. In its written statement of reasons, the court set forth the history of plaintiff's hiring and the termination of her employment. It described the parties' contentions in detail and began its analysis by addressing the religious exemption in the LAD. The court found that the LAD prohibits discrimination in the work place, but noted that it provided for "a broad exemption for religious institutions" utilizing religious criteria as part of their employment criteria. It applied the exemption to the analysis for LAD claims stated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and concluded that plaintiff could not establish a prima facie case of discrimination. The court determined that plaintiff could not

satisfy the second prong of the <u>McDonnell Douglas</u> test because by being pregnant and unwed, she "became unqualified to hold her position and therefore cannot demonstrate a prima facie case." In determining plaintiff was not qualified, the court relied on defendant's policies and its faculty handbook, as well as plaintiff's deposition testimony that she was aware that the church did not condone premarital sex. Relying on the certification filed by McKenna in defendant's earlier motion about an incident in another school, it also found plaintiff provided no evidence of pretext.

Turning to the application of the First Amendment, the trial court concluded that "even in the absence of the statutory application of the LAD, . . . the First Amendment bar[s] [p]laintiff's claims." Citing our opinion in <u>Gallo v. Salesian Soc'y</u>, Inc. 290 N.J. Super. 616, 651-52 (App. Div. 1996), it stated "courts may not define the scope of one's religious beliefs, or intrude upon the teachings of a recognized religious institution." Quoting from the Supreme Court's opinion in <u>McKelvey v. Pierce</u>, 173 N.J. 26, 32-33 (2002), the trial court stated that it was not permitted to "allow intrusive discovery [into] or define religious dogma," but could resolve a dispute so long as it was not required "to choose between competing

interpretations of religious tenets or to interfere with a church's autonomy rights."

In conclusion, the court rejected plaintiff's reliance on the fact that due to her lay status, "she does not fall under [the] 'ministerial test[,]'" a religious exemption to the LAD, and decided it was inapposite. Instead, the court found dispositive the exemption's provision that "it shall not be an unlawful practice . . . in following the tenets of its religion in establishing and utilizing criteria for []employment of an employee." This appeal followed.

We review a court's grant of summary judgment de novo, applying the same standard as the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pitt., 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)).

Applying our de novo standard of review, at the outset, we concur with the trial court's explanation of the court's limits when being asked to decide purely religious issues. We also

acknowledge a Catholic school's right to terminate a "teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles." Gallo, 290 N.J. Super. at 641 (quoting Little v. Wuerl, 929 F.2d 944, 951 (3d Cir. 1991)).

The prohibition against court inquiry and involvement, however, does not apply to civil adjudication of purely secular legal questions that do "not entail theological or doctrinal evaluations[,]" even if they "involv[e] some background issues of religious doctrine . . . ." Elmora Hebrew Ctr., Inc. v. Fishman, 125 N.J. 404, 414-15 (1991). "Only when the underlying dispute turns on doctrine or polity should courts abdicate their duty to enforce secular rights. Judicial deference beyond that demarcation would transform our courts into rubber stamps invariably favoring a religious institution's decision regarding even primarily secular disputes." Gallo, 290 N.J. Super. at 631 (quoting Welter v. Seton Hall Univ., 128 N.J. 279, 293-94 (1992)).

In the context of an LAD claim of pretext,

> when the pretext inquiry neither traverses questions of the validity of religious beliefs nor forces a court to choose between parties' competing religious visions, that inquiry does not present a significant risk of entanglement [that exists when] a plaintiff [seeks to] challenge the validity,

existence or "plausibility" of a proffered religious doctrine . . . .

> [Id. at 647-48 (quoting Geary v. Visitation of the Blessed Virgin Mary Par. Sch., 7 F.3d 324, 330 (3d Cir. 1993)).]

To be clear, in this case, plaintiff does not raise any challenge to defendant's religious doctrines or its right to specify a code of conduct for its employees based on that doctrine. Rather, she seeks an adjudication of her claim that she has been singled out for application of that doctrine as a pretext for impermissible discriminatory reasons. If proven, such conduct by defendant would be a violation of secular law protecting against discrimination.

"[T]he State's interest in abolishing age and gender discrimination is compelling, beyond cavil, and that enforcement of that interest does not constitute a substantial burden on religion in the circumstance of a . . . lay teacher . . . ." Id. at 643-44 (citations omitted). As we observed in Gallo:

> Our Supreme Court has asserted that "[t]he elimination of discrimination in educational institutions is particularly critical." "The[re] . . . [is no] more sensitive area than educational institutions where . . . youth are exposed to a multitude of ideas that will strongly influence their future development. To permit discrimination here would, more than in any other area, tend to promote misconceptions leading to future patterns of discrimination."

> [Id. at 641-42 (alterations in original) (citations omitted).]

In a school discrimination case, "intrusiveness of carefully measured discovery is no reason to exempt defendants from LAD scrutiny where the school's spiritual functions are not in issue.  Defendants are not entitled to a blanket exemption from all secular regulations because of their status as a religious institution."  Id. at 652.

We, therefore, part company with the trial court's application of the First Amendment and the limits it identified in determining whether plaintiff should have been precluded from discovery as to defendant's treatment of other employees who violated any of defendant's religious ethical standards, or whether defendant was entitled to summary judgment.  Contrary to the trial court's repeated statement that plaintiff sought for the court to make determinations about defendant's "dogma and polity[,]" neither allowing broader discovery nor considering plaintiff's position on summary judgment required such determinations, especially in light of defendant's principal's position that other behavior or marital status — i.e., being divorced - were the equivalent of plaintiff's alleged violation. Under these circumstances, the only issue the trial court had to

consider related solely to defendant's conduct rather than defining or determining the propriety of its "dogma and polity."

As the Supreme Court has observed, "[t]he Free Exercise Clause [of the First Amendment] protects religious freedom by 'embrac[ing] two concepts, -- freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.'" McKelvey, 173 N.J. at 40 (third alteration in original) (quoting Cantwell v. Connecticut, 310 U.S. 296, 303-04 (1940)). "[A] discrimination claim brought by a lay employee against a religious employer, without more, generally does not run the risk of excessive entanglement, as such an inquiry constitutes only the sort of 'routine regulatory interaction which involves no inquiries into religious doctrine . . . .'" Redhead v. Conference of Seventh-Day Adventists, 566 F. Supp. 2d 125, 133 (E.D.N.Y. 2008) (citations omitted).

Having determined that the First Amendment does not bar plaintiff's claim or our involvement, we turn to our analysis of plaintiff's claim under the LAD. The LAD prohibits discriminatory employment practices. Viscik v. Fowler Equip. Co., 173 N.J. 1, 13 (2002). "[I]t is not the purpose of the LAD 'to prevent the termination or change of the employment of any

person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment . . . .'" Jason v. Showboat Hotel & Casino, 329 N.J. Super. 295, 302-03 (App. Div. 2000) (quoting N.J.S.A. 10:5-2.1). Rather, "[i]n order to sustain a claim of unlawful discrimination under [the LAD], there must be proof of an intent to discriminate for an unlawful purpose." Kearny Generating Sys., Div. of Pub. Serv. v. Roper, 184 N.J. Super. 253, 261 (App. Div. 1982); see also Jones v. Coll. of Med. & Dentistry, 155 N.J. Super. 232, 236 (App. Div. 1977) ("Discrimination involves the making of choices. The statute does not proscribe all discrimination, but only that which is bottomed upon specifically enumerated partialities and prejudices."). Thus, discriminatory motive or intent "is a crucial element in a discrimination case . . . ." Goodman v. London Metals Exch., Inc., 86 N.J. 19, 30 (1981). "The establishment of the prima facie case creates an inference of discrimination . . . ." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 449 (2005) (citing Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

Discriminatory intent or any other element of an LAD claim cannot be established by a religious institution's requiring an employee to follow the tenets of its religion as a condition of employment. The LAD specifically states:

> it shall not be an unlawful employment practice . . . for a religious association or organization to utilize religious affiliation as a uniform qualification in the employment of clergy, religious teachers or other employees engaged in the religious activities of the association or organization, or <u>in following the tenets of its religion in establishing and utilizing criteria for employment of an employee</u> . . . .
>
> [N.J.S.A. 10:5-12(a) (emphasis added).]

To prove employment discrimination under the LAD, New Jersey courts have adopted the burden-shifting analysis established in <u>McDonnell Douglas</u>, 411 U.S. at 802. See <u>Viscik</u>, 173 N.J. at 13-14. Under that analysis, a plaintiff must first present sufficient evidence to establish a prima facie case of unlawful discrimination. <u>Dixon v. Rutgers</u>, 110 N.J. 432, 442 (1988). "The evidentiary burden at the prima facie stage is 'rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent--i.e., that discrimination could be a reason for the employer's action.'" <u>Zive</u>, 182 N.J. at 447 (citations omitted).

Like any other LAD case, a plaintiff who is fired from a position with a religious institution for breaching a religious tenet is entitled to offer evidence relating to "whether unequal treatment has occurred, intentionally or as a result of a policy's impact on members of a protected group, [through] two

approaches [that] have been generally accepted. . . .--disparate treatment and disparate impact--and we acknowledge both as cognizable under the LAD." Gerety v. Atl. City Hilton Casino Resort, 184 N.J. 391, 398 (2005) (citing Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 81-82 (1978)). Disparate treatment is defined as where "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." Ibid. (quoting Peper, 77 N.J. at 81).

In order to establish a claim for disparate treatment under the LAD:

> [T]he plaintiff must demonstrate that he or she (1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified;[3] (3) was

---

[3]  In order to satisfy the second prong, a

> plaintiff [need only] produce evidence showing that she was actually performing the job prior to the termination. Along with the remaining prongs of the prima facie case, that evidence is sufficient to support the conclusion that the plaintiff's claim of discrimination is plausible . . . .
>
> [A]lthough a plaintiff's acknowledgment of performance deficiencies does not factor into the second prong of the prima facie case, it will generally lighten the employer's burden on the second phase and render more difficult plaintiff's ability to prove pretext.

(continued)

not hired or was terminated from that position; and (4) the employer sought to, or did fill the position with a similarly-qualified person.

[<u>Id.</u> at 399 (citing <u>Andersen v. Exxon Co.</u>, 89 N.J. 483, 492 (1982)).]

After a plaintiff demonstrates the four elements establishing a prima facie case, "[t]he burden then shifts to the employer to prove a legitimate, non-discriminatory reason for the employment action." <u>Gerety</u>, 184 N.J. at 399 (citing <u>Andersen</u>, 89 N.J. at 493). If the employer meets that burden, the plaintiff has an opportunity to show that the employer's purported reason is merely pretext. <u>Ibid.</u>

"Evidence of pretext sufficient to permit the employee to reach a jury may be indirect, such as a demonstration 'that similarly situated employees were not treated equally.'" <u>Jason</u>, 329 N.J. Super. at 304 (citations omitted). "An inference of discrimination may arise if similarly situated employees of a different [gender] received more lenient treatment than that afforded plaintiff." <u>Ewell v. NBA Props.</u>, 94 F. Supp. 3d 612, 624 (D.N.J. 2015) (citing <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 645 (3rd Cir. 1998)). A plaintiff

---

(continued)

[<u>Zive</u>, 182 N.J. at 454, 456.]

must present evidence sufficient to prove that he or she is "similarly situated" to his or her comparators, and that these employees have been treated differently or favorably by their employer. See Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003).

"An 'inference of discrimination' does not [necessarily] arise 'anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably.'" Jason, 329 N.J. Super. at 307 (citations omitted). There must be proof that the individuals being compared were similarly situated. "[T]here is no bright-line rule for determining who is a 'similarly situated' employee." Id. at 305. To determine whether employees are similarly situated, "courts tend to consider whether the plaintiff and the comparator had similar job responsibilities, were subject to the same standards, worked for the same supervisors, and engaged in comparable misconduct." Ewell, 94 F. Supp. 3d at 624 (citations omitted). That does "not mean to suggest that [the listed] aspects of "similarly situated" status are exhaustive or of equal significance in different employment contexts. The trial [court must] make a sensitive appraisal in each case to determine the most relevant

criteria." <u>Jason</u>, 329 N.J. Super. at 305 (first alteration in original) (quoting <u>Peper</u>, 77 N.J. at 85).

In a case involving the firing of a pregnant employee, evidence of how male employees were treated is particularly useful in determining whether unmarried pregnant women are treated differently. Absent evidence that men are treated the same way as women who are terminated for engaging in premarital sex, a religious institution violates LAD because if "'women can become pregnant [and] men cannot,' it punishes only women for sexual relations because those relations are revealed through pregnancy." <u>Cline v. Catholic Diocese of Toledo</u>, 206 F.3d 651, 667 (6th Cir. 1999) (alteration in original) (citations omitted). "[A] school [cannot] use the mere observation or knowledge of pregnancy as its sole method of detecting violations of its premarital sex policy."[4] <u>Ibid.</u>. "[W]omen [cannot] be subject to termination for something that men would not be, [as] that is sex discrimination, regardless of the justification put forth for the disparity." <u>Vigars v. Valley</u>

_____

[4] In <u>Cline</u>, the Sixth Circuit vacated summary judgment in favor of a Catholic school that fired a pregnant employee after it correctly assumed that she engaged in premarital sex, and therefore, violated its "Affirmations for Employment" that prohibited employees from "by word and example[, not] reflect[ing] the values of the Catholic Church." 206 F.3d at 656, 669.

Christian Ctr. of Dublin, Cal., 805 F. Supp. 802, 808 (N.D. Cal. 1992) (denying summary judgment in favor of defendant in a pregnancy discrimination case in which the employer relied upon a religious exemption).

Applying these guiding principles here, we conclude that, contrary to the trial court's determination, plaintiff established a prima facie claim under the LAD. See Zive, 182 N.J. at 447-48. The evidence presented by plaintiff established that plaintiff through her marital status and pregnancy was a member of a protected class, a pregnant woman. She proved her qualification by relying upon her job history and the fact that defendant asked her to assume additional responsibilities right before terminating her. See id. at 455 (stating that "only the plaintiff's evidence should be considered"). It was undisputed plaintiff suffered an adverse employment consequence when defendant fired her, and the circumstances of her firing "give[s] rise to an inference of unlawful discrimination." Young v. Hobart W. Grp., 385 N.J. Super. 448, 463 (App. Div. 2005) (quoting Williams v. Pemberton Twp. Pub Schs., 323 N.J. Super. 490, 502 (App. Div. 1999)).

Contrary to the trial courts finding, defendant's proffered "legitimate, nondiscriminatory reason for [its] actions[,]" Zive, 182 N.J. at 449 (citing Clowes v. Terminix Int'l, Inc.,

109 N.J. 575, 596 (1988)), cannot be the basis for finding that plaintiff failed to establish she was qualified for the position because it related to the policy that plaintiff argues is discriminatory in its application, rather than plaintiff's job performance. See Cline, 206 F.3d at 660. Under plaintiff's proofs, it was undisputed she was not fired because of poor job performance, and therefore, she met her obligation "to demonstrate 'that [s]he was "qualified" in the sense that [s]he was doing h[er] job well enough to rule out the possibility that [s]he was fired for inadequate job performance, absolute or relative.'" Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 514-15 (4th Cir. 2006) (citations omitted).[5]

Defendant's reliance on plaintiff's violation of defendant's policy did not render her unqualified for purposes of determining whether plaintiff established a prima facie

---

[5] We reject as inapposite defendant's reliance on Warch's criticism of Cline. See Warch, 435 F.3d at 515-17. Cline involved, as here, an attempt by a defendant religious school to rely upon its policy against premarital sex to defeat the plaintiff's argument that she established a prima facie case. 206 F.3d at 655-56. Warch addressed its plaintiff's argument that the employer could not rely on its view that the plaintiff was not qualified because he could not and did not meet the employer's job performance requirements. 435 F.3d at 514. As discussed here, under Zive, the use of alleged discriminatory policies does not undermine a plaintiff's prima facie case where plaintiff establishes there is no issue as to her job performance.

claim.  See Geary, 7 F.3d at 331; Redhead, 440 F. Supp. 2d at 222; Ganzy v. Allen Christian Sch., 995 F. Supp. 340, 359 (E.D.N.Y 1997).

In Zive, our Supreme Court explained:

> All that is necessary is that the plaintiff produce evidence showing that she was actually performing the job prior to the termination. Along with the remaining prongs of the prima facie case, that evidence is sufficient to support the conclusion that the plaintiff's claim of discrimination is plausible enough to warrant promotion to the next step of the McDonnell Douglas test. That is not a heavy burden nor was it meant to be. Indeed, the opposite conclusion would have the effect of precluding cases in which poor performance contributed to but was not the determinative factor in the termination decision.
>
> As we have indicated, only the plaintiff's evidence should be considered. That evidence can come from records documenting the plaintiff's longevity in the position at issue or from testimony from the plaintiff or others that she had, in fact, been working within the title from which she was terminated. Because performance markers like poor evaluations are more properly debated in the second and third stages of the burden-shifting test, they do not come into play as part of the second prong of the prima facie case. Thus, even if a plaintiff candidly acknowledges, on his [or her] own case, that some performance issues have arisen, so long as he [or she] adduces evidence that he [or she] has, in fact, performed in the position up to the time of termination, the slight burden of the second prong is satisfied. Simple proof of continued employment is not enough. That

A-1294-16T4

> formulation of the second prong is an apt analogy to the second prong of <u>McDonnell Douglas</u>; any other interpretation would ratchet up the second prong in a termination case and upend the "complex evidentiary edifice" built by <u>McDonnell Douglas</u>.
>
> [<u>Zive</u>, 182 N.J. at 454-55 (citations omitted).]

Having determined that plaintiff established a prima facie claim under the LAD, the remaining issue on summary judgment therefore focuses on whether defendant's asserted reason for firing plaintiff was pretextual. That determination requires inquiry into material questions of fact relating to defendant's conduct in either firing or retaining employees who are known to have violated defendant's code of ethics and whether the decision has been applied uniformly, regardless of gender, marital status or pregnancy. See <u>Redhead</u>, 440 F. Supp. 2d at 223.

On summary judgment, the only evidence of the policy being violated and enforced against plaintiff was the obvious inference plaintiff engaged in premarital sex, based on Lee's determination plaintiff was unmarried, the handbook and related documents that did not mention premarital sex as prohibited conduct, Lee's testimony that plaintiff's conduct was part of a litany of behavior that would give rise to a violation, and, plaintiff's statement that she understood premarital sex to be a

A-1294-16T4

violation of Catholic tenets. There was no evidence, however, of how male or not pregnant female teachers at defendant's school who engaged in premarital sex were detected or treated by defendant, or how it responded to any other teacher who it knew violated other tenets of the Catholic faith as determined by defendant's school principal. Thus, there were questions of material fact that should have prevented the award of summary judgment to defendant.

The lack of evidence on summary judgment regarding defendant's treatment of other teachers or employees suspected of violating the Church's code is directly attributable to the trial court's April 22, 2014 discovery order. The order barred discovery of relevant information because of the trial court's misapplication of First Amendment proscriptions. For that reason, we conclude the trial court abused its discretion, <u>see Pomerantz Paper Corp. v. New Cmty. Corp.</u>, 207 N.J. 344, 371 (2011), and its order must be reversed so that plaintiff can have discovery on the issue of defendant's treatment of all "similarly situated" employees who defendant knew were in violation of its ethics code. For the same reason, the trial court's denial of reconsideration was also an error.

The order granting defendant summary judgment is reversed, without prejudice to either party seeking the same relief after

27

the completion of discovery. The orders denying reconsideration and limiting plaintiff's discovery are also reversed. The matter is remanded to the trial court for entry of a case management order to permit discovery in accordance with this opinion, consider any ensuing summary judgment applications and, if necessary, trial.

Reversed and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

28                                                    A-1294-16T4